450 So.2d 1168 (1984)
Robert T. WILKINSON, Appellant,
v.
FLORIDA ADULT CARE ASSOCIATION, INCORPORATED, a Florida Not-for-Profit Corporation; Madge H. Luker; John J. Piazza; James E. Ruley; and Ina Perry, Appellees.
No. 83-1063.
District Court of Appeal of Florida, Second District.
May 2, 1984.
Rehearing Denied June 7, 1984.
*1169 Daniel Joy, Sarasota, for appellant.
James W. Kelly, Avon Park, for appellee Ina Perry.
W.F. Davenport, Jr., of Harris, Green, Piper & Davenport, St. Petersburg, for appellees Florida Adult Care Ass'n, Luker, Piazza and Ruley.
GRIMES, Judge.
In this defamation action, appellant contests the trial court's finding that he was a public official.
The instant controversy arose from the investigation of an adult congregate living facility (ACLF) in Sebring owned by Ms. Ina Perry.[1] Appellant was an ACLF coordinator for the Department of Health and Rehabilitative Services (HRS) in the Fort Myers district office. He had received a report of possible negligent treatment of certain elderly persons residing at Ina's Boarding Home. With the approval of his supervisor, appellant, accompanied by a female HRS social worker and a county public health nurse, visited the boarding house on August 22, 1979, in Perry's absence. After arriving, appellant informed a staff member that they were there in response to an abuse complaint and that he wanted to see certain records of the residents. His two companions then proceeded to conduct physical "assessments" on a number of the elderly residents to check for bedsores.[2] During the hour long visit, appellant allegedly viewed the buttocks of an elderly male. Ms. Perry returned to the house after the three departed. She reacted very emotionally to the inspection and subsequently filed a complaint with the police for assault and battery against the three personnel.
Later that evening, Ms. Perry contacted James E. Ruley, another Sebring ACLF operator, to inform him of the nature of the visit and the persons involved. Ruley then called John J. Piazza, vice president of the Florida Adult Care Association, Inc. (FACA), a nonprofit trade organization which promotes the interests of ACLF operators. Piazza directed Ruley to personally follow up the incident at Perry's boarding home.
The next day, August 23, 1979, Ruley spoke with the staff, several residents and their relatives at Perry's and took sworn statements. However, he did not contact any of the three personnel nor did he call the HRS district office. Ruley then relayed his findings to Madge H. Luker, the FACA president, who lodged a complaint against the staff members with HRS in Tallahassee. Luker alleged that an unannounced inspection had been made at Ina's Boarding Home which greatly upset the residents.
On August 24, a telegram was sent out by FACA over the signature of Piazza, advising several members of the legislature and media that a press conference would be held on Monday, August 27, at Ina's Boarding Home. The telegram called for the appointment of a task force to investigate alleged abuses which had occurred there during a visit conducted by the members of the Fort Myers District 8 HRS staff. The abuses included the humiliation of the residents because of unauthorized physical examinations.
The reason for the direct involvement of FACA was prompted by the organization's desire to establish standardized HRS regulations throughout the state. Piazza, Luker, and Ruley, as officers of FACA, decided to capitalize upon the publicity of the Perry incident to promote their campaign for modification of the rules.
*1170 Over the weekend, both the Tampa Tribune and the Fort Myers News Press published articles to the effect that elderly residents of Ina's Boarding Home had been stripped to expose their genitals during an HRS tour. On Monday, August 27, 1979, a morning press conference was held in St. Petersburg led by Piazza and Luker. An afternoon conference was conducted at Perry's facility in Sebring, attended by Piazza, Luker, Ruley, and Perry. The FACA representatives spoke briefly at each session and distributed copies of the press release. The release, issued in the name of FACA, was based on the sworn affidavits and the investigation conducted at Perry's by Ruley. The release stated that unnamed officials from the Fort Myers District 8 HRS Adult Congregate Living Facility staff and a public health nurse required the residents at Ina's Boarding Home to "submit to a physical examination of their genitals and other intimate parts of their bodies." The release continued that the staff had no authority to perform such examinations which violated "the rights and privacy of these residents." The FACA called upon the governor, HRS secretary, and legislature to authorize a full investigation of the incident and to suspend the HRS officials involved. The release concluded with a demand for the temporary restraint of all further investigations of ACLF homes until HRS clearly defined the job descriptions and scope of authority of its field staff. Following the conference, additional articles appeared in the Tampa and Fort Myers papers.
Appellant instituted litigation by filing a three count complaint against appellees Perry, Ruley, Piazza, Luker, and the FACA for defamation and conspiracy to defame. Following the filing of appellant's second amended complaint, a three-day jury trial ensued. At the close of appellant's case, the court granted appellees' motion for directed verdict. In the final judgment for appellees, the court stated:
Plaintiff was, at the time of the alleged defamation by Defendants, a public official. For Plaintiff to recover, he must prove by clear and convincing evidence that these defendants in the alleged defamatory statement acted toward Plaintiff with "actual malice"; that is, with knowledge that the statement was false or with reckless disregard of whether it was false or not. New York Times v. Sullivan, 376 U.S. 254 [84 S.Ct. 710, 11 L.Ed.2d 686] (1964); Palm Beach Newspapers, Inc. v. Early, 334 So.2d 50 (4th DCA 1976). Plaintiff has not met that burden of proof; he has not shown that defendants entertained serious doubts as to the truth of the statement, that they deliberately falsified the statement or were aware of its probable falsity at the time of publication. Without such proof Plaintiff cannot recover. Times Publishing Company v. Huffstetler, 409 So.2d 112 (Fla. 5th DCA 1982). In sum, no possible view of Plaintiff's evidence can sustain his position.
Appellant argues before this court that his position as an ACLF coordinator does not create the status of a public official for defamation purposes. He further contends that even assuming he were a public official, he has established a prima facie case of actual malice against appellees through evidence of the oral and written communications of the FACA. Although acknowledging that his name was not stated directly, appellant asserts that FACA's references to the HRS inspection team, to the ACLF inspectors for District 8 of HRS, and to the circumstances of the incident all constituted such intrinsic references to appellant that third parties would understand that he was the object of appellees' publications.
After reviewing the record, we find no evidence of actual malice. Therefore, we agree with the trial court's conclusion that appellant did not carry the requisite burden of proof to sustain a cause of action for defamation of a public official. We are more concerned with the trial court's designation of appellant as a public official as a matter of law, which constitutes the threshold issue of this case. The remainder of our discussion will focus on that point.
*1171 The case of New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), established a constitutional rule in regard to a defamation action brought by a public official in state courts. Acknowledging an overriding interest in free expression under the first amendment, Justice Brennan wrote, "the constitutional guarantees require, we think, a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with `actual malice'  that is, with knowledge that it was false or with reckless disregard of whether it was false or not." Id. at 279-80; 84 S.Ct. at 725-26; 11 L.Ed.2d at 706. The Court declined to define the term "public official." The question was addressed shortly thereafter, however, in Rosenblatt v. Baer, 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966), where the Court stated:
[T]he "public official" designation applies at the very least to those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs.
... Where a position in government has such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it, beyond the general public interest in the qualifications and performance of all government employees, ... the New York Times malice standards apply.
Id. at 85-86, 86 S.Ct. at 675-76, 15 L.Ed.2d at 605-06 (footnotes omitted).[3] Recognizing that the initial determination of public official status is to be made by the trial court, the Court rejected the use of statelaw standards devised for administrative reasons rather than for purposes of national constitutional protection. In a footnote, the Court also commented that a public official designation does not attach simply because one is in government employment. The position must be one which would invite public scrutiny in discussion of the individual totally apart from the discussion occasioned by the particular charges in controversy. Id. at 86, n. 13, 86 S.Ct. at 676, n. 13, 15 L.Ed.2d at 606, n. 13.
Since the Rosenblatt decision, federal and state courts have shown little consistency in applying the New York Times rule. The designation of public official has been given (1) to persons who are elected: Simonson v. United Press International, Inc., 654 F.2d 478 (7th Cir.1981) (county judge); Times Publishing Co. v. Huffstetler, 409 So.2d 112 (Fla. 5th DCA), petition for review denied, 417 So.2d 329 (Fla. 1982) (circuit judge); Coleman v. Collins, 384 So.2d 229 (Fla. 5th DCA 1980) (city attorney); Holter v. WLCY T.V., Inc., 366 So.2d 445 (Fla. 2d DCA 1978), cert. denied, 373 So.2d 462 (Fla. 1979) (town mayor); Palm Beach Newspapers, Inc. v. Early, 334 So.2d 50 (Fla. 4th DCA 1976), appeal dismissed, 354 So.2d 351 (Fla. 1977), cert. denied, 439 U.S. 910, 99 S.Ct. 277, 58 L.Ed.2d 255 (1978) (superintendent of county school system); Thomson v. Cash, 119 N.H. 371, 402 A.2d 651 (1979) (state governor); (2) to those who are currently running for office: Ocala Star-Banner Co. v. Damron, 401 U.S. 295, 91 S.Ct. 628, 28 L.Ed.2d 57 (1971) (town mayor as candidate for county tax assessor); Menendez v. Key West Newspaper Corp., 293 So.2d 751 (Fla. 3d DCA 1974) (candidate for city commission); (3) to former officeholders: Finkel v. Sun Tattler Co., 348 So.2d 51 (Fla. 4th DCA 1977), cert. denied, 358 So.2d 135 (Fla. 1978) (former city attorney); Rinaldi v. Viking Penguin, Inc., 101 Misc.2d 928, 422 N.Y.S.2d 552 (N.Y. Sup. Ct. 1979), modified, 73 A.D.2d 43, 425 N.Y.S.2d 101 (1980), aff'd, 52 *1172 N.Y.2d 422, 420 N.E.2d 377, 438 N.Y.S.2d 496 (1981) (former state supreme court justice); Hodges v. Oklahoma Journal Publishing Co., 617 P.2d 191 (Okl. 1980) (former license tag agent); and (4) to persons who obtained their position by appointment: Goodrick v. Gannett Co., 500 F. Supp. 125 (D.Del. 1980) (assistant public defender); Russell v. Smith, 434 So.2d 342 (Fla. 2d DCA 1983), petition for review granted, (Fla. Jan. 9, 1984) (No. 64,086) (police officer); Harrison v. Williams, 430 So.2d 585 (Fla. 4th DCA 1983) (police officer); Cape Publications, Inc. v. Adams, 336 So.2d 1197 (Fla. 4th DCA 1976), cert. denied, 348 So.2d 945 (Fla.), cert. denied, 434 U.S. 943, 98 S.Ct. 440, 54 L.Ed.2d 305 (1977) (city building official); Bishop v. Wometco Enterprises, Inc., 235 So.2d 759 (Fla. 3d DCA), cert. denied, 240 So.2d 813 (Fla. 1970) (investigator paid as professional employee of city); Burke v. Deiner, 190 N.J. Super. 382, 463 A.2d 963 (N.J.Super.Ct. App.Div. 1983) (executive director of city parking authority).[4] Generally, such persons occupied upper level political or administrative positions where they affected government conduct, exercised independent authority, supervised lower level employees, and appeared influential to the general public.
Cases in which individuals were held not to be public officials include: Zurek v. Hasten, 553 F. Supp. 745 (N.D.Ill. 1982) (accountant for state commerce commission lacked prosecutorial or adjudicatory authority); Forrest v. Lynch, 347 So.2d 1255 (La. Ct. App. 1977) (private engineer advising on school communication system and responsible only to architect lacked substantial control over governmental conduct); Durham v. Cannan Communications, Inc., 645 S.W.2d 845 (Tex.Civ.App. 1982) (former special prosecutor held no current government position and statements did not go to official conduct). These persons were too removed to impact upon governmental affairs, and they did not otherwise draw public attention to their positions.
Our immediate concern is whether appellant as an ACLF coordinator within the Department of HRS is a public official for purposes of the instant defamation action. To make this determination, we need to review the testimony and other evidence of record regarding appellant's employment status and duties. Appellant testified that his two primary tasks were to inspect ACLF licensee applicants and to coordinate the inspections of other agencies, such as the fire marshal, sanitation department, and public health nurse in regard to an individual ACLF home. On the basis of his report, appellant and his supervisor would jointly recommend to a district administrator whether to issue a new license or renew an existing one. He alone had no authority to issue a license. The revocation of a license involved a more complicated procedure which was completed by an upper level staff member. Within his job description, appellant was to check on routine complaints filed against a licensee. When a serious charge was lodged, however, such as that of resident abuse, the case was to be referred to an HRS field representative. Appellant was not to initiate an investigation of the facility himself. Rather, he was to coordinate the work of other personnel and then submit a followup report recommending possible action. The remainder of appellant's duties were of a procedural nature: checking resident records; monitoring the paper work of an ACLF; explaining HRS regulations to ACLF operators; pointing out deficiencies in a home; and insuring proper compliance with HRS standards. Apparently, he had minimal contact with the general public beyond the residents and personnel of the ACLF's within his district. He had no staff of his own.
In evaluating the position of an ACLF coordinator under the definition of Rosenblatt, we conclude that such a position does not fall within the public official designation. In determining whether appellant *1173 had, or appeared to have, substantial responsibility for governmental affairs, we find that appellant had only minimal control over ACLF operations. He was not involved in formulating policy or other decision making. He had no administrative or prosecutorial function. He handled no public funds. He worked under the direction of a supervisor and had no staff responsible to him. Even his participation in the licensure process was by way of recommendation.
Moreover, we find no independent public interest in appellant's qualifications as an ACLF coordinator. The record reflects that appellant had little exposure in the general community. His position did not appear to be one that called for special public scrutiny other than that generated from the instant controversy. Overall, appellant's status seemed to be one of a midlevel employee monitoring state licensees within the extended HRS hierarchy.
Because appellant's position does not meet the definition of Rosenblatt, we conclude that an ACLF coordinator is not a public official for purposes of defamation. We distinguish our recent decision in Russell v. Smith designating a police officer as a public official, based upon the essential nature of his functions which includes the power to arrest.
Accordingly, the lower court order granting defendants' motion for directed verdict and final judgment is hereby reversed.
BOARDMAN, A.C.J., and DANAHY, J., concur.
NOTES
[1] Simply stated, an ACLF is a licensed group residence for persons who do not require constant medical supervision but need physical assistance for their daily activities. § 400.402(4), Fla. Stat. (1979).
[2] An "assessment" is a nurse's observation of the outward behavior and physical appearance of a patient; it is not a complete medical examination.
[3] The decision of New York Times created a constitutional privilege for defamation of a public official in order to foster debate on public issues. Inevitably, the protection of the privilege was extended to defamatory statements of public figures. Curtis Publishing Co. v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967). As noted in Rosenblatt, however, one does not become a public figure simply by virtue of his participation in the particular controversy. Thus, Wilkinson clearly was not a public figure for purposes of this case.
[4] See Annot., 19 A.L.R.3d 1361 (1968), for an extended list of cases on particular public officials.