**John CERASANI, Plaintiff,**

v.

**SONY CORPORATION, Sony Pictures Entertainment, Tristar Pictures, Mandalay Entertainment, Peter Guber, Mark Johnson, Barry Levinson, Gail Mutrux, Patrick McCormick, Alan Greenspan, Mike Newell and Paul Attanasio, Defendants.**

No. 97 Civ. 2372(DC).

United States District Court, S.D. New York.

Jan. 15, 1998.

constitutional issue raised by the application of the statute of limitations to bar his petition.

Slotnick, Shapiro & Crocker, L.L.P. by Barry I. Slotnick, J. Lawrence Crocker, Michele Levy, New York City, for Plaintiff.

Parcher, Hayes & Liebman, P.C. by Jonathan Liebman, Orin S. Snyder, New York City, for Defendants.

## OPINION

CHIN, District Judge.

In 1976, FBI Agent Joseph D. Pistone assumed the identity of Donnie Brasco, a jewel thief and burglar, and infiltrated the Bonanno Crime Family. Remarkably, he remained undercover for some six years.

Pistone told his story from the witness stand in a series of organized crime cases, beginning with the 1982 trial of *United States v. Napolitano* here in the Southern District of New York. Pistone's efforts led to more than one hundred convictions. He told his story again in the 1987 book "Donnie Brasco: My Undercover Life In the Mafia." And last year, his story was retold in the motion picture "Donnie Brasco," starring Al Pacino and Johnny Depp.

In the present case, plaintiff John Cerasani maintains that he was defamed in the pre-release and official versions of the film, which he claims depict him viciously beating a driver during a truck hijacking, brutally beating the maitre d' of a Japanese restaurant, and participating in the gruesome murder of at least one Bonanno Family Captain. Cerasani denies committing these acts. He argues that he was never charged with participating in or conspiring to commit murder, and that while he was a defendant in *United States v. Napolitano*, he was acquitted of all charges. Defendants Sony Pictures Entertainment, TriStar Pictures, Mandalay Entertainment, Peter Guber, producers and distributors of the film, move to dismiss plaintiff's amended complaint for failure to state a claim upon which relief may be granted, pursuant to Fed.R.Civ.P. 12(b)(6). Plaintiff cross-moves for leave to amend the amended complaint, pursuant to Fed.R.Civ.P. 15(a).

Defendants' motion raises a host of issues. The principal one is whether Cerasani's reputation is so "badly tarnished" that he is "libel-proof." Although Cerasani was acquitted

of all charges in *United States v. Napolitano*, he was the subject of Pistone's testimony as well as numerous newspaper articles describing the testimony. In addition, Cerasani pled guilty in federal court in Florida in 1985 to racketeering and committing the predicate acts of conspiring to rob a bank and possessing marijuana, cocaine, and heroin with intent to distribute. Cerasani's alleged misdeeds were also described in great detail, and he was identified by name, in Pistone's book, which was first published in 1987, became a best seller, and was republished in 1997. Finally, Cerasani was also recently indicted in this District in *United States v. Gangi*, a case in which Cerasani and eighteen other defendants are charged with racketeering, extortion, and securities fraud and Cerasani is alleged to be a Mafia enforcer in a scheme to manipulate the stock market.

In view of these indisputable facts, of which I take judicial notice, I hold that Cerasani's reputation is so "badly tarnished" that, even assuming the pre-release and official versions of the film are defamatory, he can suffer no further harm and hence no reasonable jury could award him anything more than nominal damages. Accordingly, I conclude that Cerasani is "libel-proof." For that reason, as well as the other reasons set forth below, defendants' motion is granted and plaintiff's cross-motion is denied.

The amended complaint is dismissed.

## BACKGROUND

### A. The Facts

#### 1. John Cerasani

##### a. United States v. Napolitano

Cerasani is not a model citizen. On July 7, 1982, a Federal Grand Jury in this district indicted Cerasani in *United States v. Napolitano, et al.*, No. 81 Cr. 803(RWS), alleging that he had participated in the criminal affairs of the Bonanno crime family. At the trial, Agent Pistone testified about Bonanno Family soldier "Lefty" Ruggiero's admissions regarding Ruggiero's and Cerasani's roles in the killings of the three mafia captains who opposed the leadership of "Sonny Black" Napolitano:

[Lefty] said there were four people in on the hit, and he said that he had the Trin in on it, that he was all cut up. That he tried to move him, but he couldn't, and he was amazed how strong Boobie [Cerasani] was, because Boobie was able to move him. (*United States v. Napolitano*, Trial Tr. at 1294:14–18). Agent Pistone explained further that "Lefty said that himself, Boobie, Jimmy Legs, Nicky and Bobby were [at the hits]." (*Id.* at 1294:24–25). The fact that Pistone's testimony about Ruggiero's admissions squarely placed Cerasani at the scene of the murders was confirmed by his trial counsel's prompt motion for severance, in which he argued: "Now there is testimony which places [Cerasani] at the scene of the crime ... they have now brought in testimony which certainly makes him an aider and abettor or one of the accomplices or instrumentalities of the homicide." (*Id.* at 1297:13–18). Though Cerasani was not charged with the homicides, evidence of his participation was admitted with an appropriate limiting instruction. (*Id.* at 1299:17–1300:2). Cerasani was ultimately acquitted of all charges against him.

### b. *Media Coverage of the Trial*

Media coverage of the *Napolitano* trial was extensive. Every major New York City newspaper reported on Pistone's testimony about Cerasani's participation in the murders of the mafia captains. *See, e.g.* Arnold H. Lubasch, *Undercover Agent Describes Discussions of Mob Murders*, The New York Times, August 5, 1982, at B1 ("[Pistone] said Mr. Ruggiero, whom he called Lefty, told him that the body was finally moved by John Cerasani, a defendant known as Boobie."); Larry Nathanson and Marvin Smilon, *Mobster's Blood Sweat and Tears, How a gangster ordered a rubout*, New York Post, August 4, 1982, at 14 (reporting Pistone's testimony that Ruggiero said: "After they shot Big Trin they tried to drag his body and they couldn't and then Boobie (defendant John Cerasani) moved him. It's amazing how strong he is."); Katherine Schaffer and Richard Rosen, *Mob-trial tape: Crime didn't pay for one suspect*, Newsday, August 5, 1982, at 5 (reporting similar Pistone testimony). The media also reported

generally on Cerasani's connections to top mafia bosses. *See, e.g.*, Katherine Schaffer and Richard Rosen, *Told capo to murder mob rival: FBI agent*, Newsday, August 6, 1982, at 3 (reporting Cerasani's reputed alliance with Bonanno gang leaders, including "Sonny Black" Napolitano, in the gang war in which three mafia captains were killed); Arnold H. Lubasch, *Witness Tells of Crime "Crew" and Its Activity*, The New York Times, July 29, 1982, at B2 ("the leadership of ['Sonny Black's'] crew was soon taken over by John Cerasani, one of the defendants in the trial").

### c. *The Florida Racketeering Conviction*

On October 26, 1985, in a federal court in Florida, Cerasani entered a plea of guilty to conspiring to violate the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962. (Liebman Decl. Ex. B). The indictment in the Florida RICO prosecution charged Cerasani with being "affiliated with an organization known as the 'Bonanno Family'" and "associated together in fact" with individuals in such other criminal organizations as the "Trafficante Family," the "Luchese Family," the "Gambino Family" and the "Chicago Outfit" in "an enterprise, commonly referred to by them as 'La Cosa Nostra,' the 'LCN' or the 'Mafia' ...." (*Id.* at ¶ 1). The indictment further charged that Cerasani had conspired with, among others, Bonanno Family Captain Dominick "Sonny Black" Napolitano and Bonanno Family Soldier Benjamin "Lefty" Ruggiero—two of the central Mafia members depicted in the book and the movie versions of Agent Pistone's story—to conduct the affairs of, and commit crimes with, the Mafia. (*Id.* at ¶ 1, Count One ¶¶ 2, 2(W), 2(X) and 28, Count Two ¶¶ 4(E), 4(F)). The indictment alleged that in furtherance of the criminal enterprise, Cerasani committed the predicate racketeering acts of conspiracy to rob a bank and possession with intent to distribute marijuana, cocaine and heroin. (*Id.*).

### d. *The New York Drug Possession Conviction*

In May 1994, Cerasani pleaded guilty in New York Supreme Court to Attempted Criminal Possession of a Controlled Sub-

stance in the Fifth Degree, and was sentenced as a predicate felon to one and one half to three years. *See People v. Cerasani,* No. 3271/92 (Sup.Ct.N.Y.Co. May 13, 1994).

### e. *The Pending RICO Indictment*

Most recently, while the motions in this case were *sub judice,* Cerasani was arrested and indicted on RICO, extortion and other charges related to his alleged role as a Mafia enforcer in an organized crime scheme to manipulate the stock of HealthTech International, primarily by infiltrating and gaining control of a small brokerage firm. On November 25, 1997, the government unsealed a twenty-five count indictment in *United States v. Gangi a/k/a "Rossi," a/k/a "Ross," et al.,* 97 Cr. 1215(DC), charging 19 individuals, including Cerasani, with racketeering, conspiracy, securities fraud, wire fraud, extortion, stock manipulation, and bank fraud, all in connection with a scheme to defraud investors and profit from sales of artificially inflated securities of HealthTech International. Cerasani was named in ten of these counts. (*See* Ind. Counts 1–8, 16–17).

According to the indictment, Cerasani "was a soldier in the Bonanno family" who "used his membership in the Bonanno family to assist the members and associates of the enterprise and others in their efforts to exercise control of brokerage firms out of which they could manipulate the market for securities." (Ind. at ¶ 9(d)). It further charged that Cerasani and others "facilitated these efforts through threats of violence." (*Id.*). In particular, counts one and two charge Cerasani and others with participation in a racketeering conspiracy and racketeering acts, including the extortion of securities brokers through the use of "actual and threatened force, violence and fear." (*Id.* at ¶ 22(a) and (b)). In addition, counts three through eight charge Cerasani and others with conspiracy to commit securities fraud, securities fraud and stock manipulation, and conspiracy to commit wire fraud.

In connection with these charges, it is alleged that Cerasani "agreed to threaten and later did threaten" various individuals associated with a particular brokerage. (*Id.* at ¶ 52). Furthermore, the indictment charges Cerasani and others with "us[ing] threats of violence in order to maintain control over those who interfered with their unlawful stock market activities." (*Id.* at ¶ 77). Finally, count sixteen of the indictment charges Cerasani with conspiracy to commit extortion and extortion, including "obtaining money and property from and with ... consent of [certain securities brokers] ... induced by ... actual and threatened force, violence and fear." (*Id.* at ¶¶ 86–87). Of course, I express no opinion as to the guilt or innocence of those indicted, including Cerasani. *See Ives Laboratories,* 638 F.2d at 544 n. 8.

### 2. *The Book*

The book "Donnie Brasco: My Undercover Life In the Mafia" (hereafter, the "book") was first published in 1987, made the New York Times Bestseller List, and was re-released in paperback in 1997 with a new cover promoting the book's association with the movie "Donnie Brasco." The book is described on its cover as "A TRUE STORY BY FBI AGENT JOSEPH D. PISTONE WITH RICHARD WOODLEY," and is a first person account of agent Pistone's six-year undercover infiltration of the Bonanno Crime Family under the alias Donnie Brasco.

John "Boobie" Cerasani appears on the first page of the book .as one of several "wiseguy defendants" in the first mob trial, all shaking their heads in disbelief at the fact that Donnie Brasco was actually a special agent with the FBI and not a fellow member of the Mafia. (Book at 9). Agent Pistone described Cerasani in the book as the "right-hand man" of Dominick "Sonny Black" Napolitano, a captain in the Bonanno Family. (*Id.* at 257). Pistone explained that:

> I had known about Boobie since 1978 because he used to come around Lefty's. Boobie was taller and leaner than Sonny, balding at the temples, with a hawklike face. He was quiet and smart, a chess lover. He ·was one mean fucker, very closemouthed, a hard guy to get to know. If you got him to talk to you, he was all right. Sonny wasn't close to a lot of people. Boobie was his confidant, capable of doing whatever was needed, which included watching Sonny's back. "I trust Boobie," Sonny says, "and that's it."

(*Id.*). Throughout the book, Pistone described crimes that Cerasani participated in as a member of Sonny Black's "crew," including drug trafficking, loansharking, illegal possession of firearms, and murder. (Book at 277, 288, 298–301, 328, 372, 382). An FBI surveillance photograph included in the book captured Cerasani talking with Sonny Black, Lefty Ruggiero, and other members of Sonny Black's "crew." (Book at photo insert).

Agent Pistone recounted Cerasani's role in the 1982 murders of three Bonanno Family captains, murders engineered to consolidate Sonny Black's power within the Bonanno Family. (Book at 362–63, 367). Pistone asked Mafia soldier Lefty Ruggiero how he "managed" one victim known as Dominick "Big Trin" Trinchera, "huge as he is?" According to Pistone, Ruggiero responded as follows:

> I couldn't move him. Boobie could. Trin was all cut open and bleeding. There was little pieces lying around from the shotgun. Boobie got blood all over him trying to pick him up. I couldn't believe how strong Boobie is. He don't look it. But I was amazed. Boobie could move him. Then they cut him up and put him in green plastic garbage bags.

(*Id.* at 382). Curiously, despite the foregoing, Pistone then reports that Ruggiero said "that the guys in on the hits were himself, Jimmy Legs, Micky Santora, and a guy named Bobby Capazzio." (*Id.*). He does not specifically mention Cerasani as being "in on the hits."

### 3. *The Movie*

#### a. *The Pre–Release Version*

As the opening credits indicate, the movie "Donnie Brasco" purports to be based upon a true story—the story told in the book. The film's credits further explain that certain characters depicted in the film are "composites or fictional characters and certain scenes are fictional." A "pre-release" screening of the movie (the "pre-release film") was conducted sometime prior to its 1997 release. Cerasani alleges that a member of the pre-release screening audience videotaped the pre-release film and disseminated it widely to third parties. (Am.Compl.¶¶ 30–32).

Cerasani complains that the pre-release film portrays a character named John "Boobie" Cerasani as participating in various criminal acts. (Am.Compl.¶ 22). In particular, Cerasani identifies three allegedly defamatory acts. First, Cerasani alleges that the Cerasani character is "implicated [] by inference" in the "vicious beating of a truck driver during a hijacking." (*Id.* at ¶ 23). In that scene, of the several participants in the beating and hijacking, only the Sonny Black character removes his ski mask. Nonetheless, Cerasani reasons that the portrayal of the Cerasani character as one of Sonny Black's right-hand men is sufficient to infer that he is one of the masked individuals. (*Id.*). Cerasani denies participating in the hijacking, and claims that the book does not describe his participation in any such activity. (*Id.* at ¶ 24).

Next, Cerasani maintains that he was defamed by the depiction in the pre-release film of the Cerasani character's participation in the brutal beating of a maitre d' in a Japanese restaurant, including punching and kicking the victim and smashing him with a garbage can. (*Id.* at ¶¶ 25–26). Again, Cerasani denies participating in any such beating, and claims that the book does not recount any such event. (*Id.* at ¶ 24).

Finally, Cerasani maintains that he was defamed by the pre-release film's portrayal of the Cerasani character's participation in the graphic murder of three organized crime figures, including "Big Trin." (*Id.* at ¶ 27). After the murder, Cerasani is depicted retrieving Brasco from the car where he is waiting, bringing him to the basement where the murders were committed, and handing Brasco a large saw-like knife that they use to dismember at least one victim's body. (*Id.* at ¶ 27). Cerasani denies murdering "Big Trin" or anyone else. He also claims that the book does not describe him committing any murders. (*Id.*).

By letter dated October 16, 1996 plaintiff's counsel contacted the General Counsel for Sony Pictures Entertainment, asserted that the portrayal of Cerasani in the Tristar Pictures movie "Donnie Brasco" was libelous, and threatened litigation in the event that the movie—or any preview or trailer—was

shown. (Am.Compl.Ex. C). Around December 4, 1996, Cerasani and his counsel viewed the then-current cut of the film. In-house counsel for Tristar pictures responded to Cerasani's concerns by letter dated December 13, 1996. (Am.Compl.Ex. D). While rejecting Cerasani's defamation claim and the notion that Cerasani had any legal basis to enjoin the release of the film, Tristar agreed not to use John "Boobie" Cerasani's name in the film. Tristar also agreed to shorten a murder scene and to delete a shot in which the character previously called "Boobie" is shown reloading his gun during the murder scene. (*See id.*).

### b. *The Final Version*

In the final version of the film that was released in theaters nationwide, the Cerasani character from the pre-release film is renamed "Paulie." Most notably, Paulie's role in the murder scene is diminished. Paulie is still depicted, however, retrieving Brasco from the car, bringing him to the basement, and proceeding to dismember one murder victim's body with a saw-like knife.

### B. *The Lawsuit*

On April 3, 1997, Cerasani filed the complaint in this case, seeking compensatory damages in excess of $50,000 and punitive damages based on two theories: (1) defamation arising out of defendants' production and distribution of the film; and (2) defendants' negligence in permitting the making of "pirated" copies of the pre-release film. Based on these two theories, Cerasani asserts two libel claims and a claim under New York Civil Rights Law § 50. On April 23, 1997, Cerasani amended his complaint as of right to seek the $75,000 required under 28 U.S.C. § 1332.

### C. *The Motions*

On July 28, 1997, defendants moved to dismiss the amended complaint for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6). On August 27, 1997, Cerasani filed his papers in opposition to defendant's motion to dismiss and cross-moved for leave to amend his complaint a second time pursuant to Fed.R.Civ.P. 15(a). Cerasani's proposed second amended complaint differs from the amended complaint as follows: (1) it adds further factual description of the pre-release screening; (2) it omits any allegation that the Cerasani character in either version of the film was involved in the beating of a truck driver during a hijacking; (3) it amends the libel claim based on the pre-release screening to allege that a duty of care was violated in showing the pre-release film to the "general public" at a pre-release screening, as well as in negligently permitting the videotaping of the pre-release film; and (4) it substitutes for the New York Civil Rights Law § 50 claim based on the final version of the film a claim under New York Civil Rights Law § 51 based on the alleged exploitation of Cerasani's identity through the screening of the pre-release version of the film.

Defendants oppose Cerasani's cross-motion to amend on the grounds that the proposed second amended complaint, like the amended complaint, is deficient as a matter of law.

### DISCUSSION

### A. *Motion To Dismiss Standard*

In reviewing a motion to dismiss, this Court must accept the factual allegations set forth in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. *See Bernheim v. Litt*, 79 F.3d 318, 321 (2d Cir.1996). A complaint may not be dismissed under Rule 12(b)(6) unless it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.* (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). In other words, the issue before the Court "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995), *cert. denied,* — U.S. ——, 117 S.Ct. 50, 136 L.Ed.2d 14 (1996). Although a court on a motion to dismiss generally may only consider facts alleged in the complaint or in documents attached to the complaint as exhibits or incorporated by reference, the court "may also consider matters of which judicial notice may be taken under Fed.R.Evid. 201." *Kramer v. Time Warner Inc.*, 937 F.2d 767,

773 (2d Cir.1991); *see also* Fed.R.Evid. 201(f) ("Judicial notice may be taken at any stage of the proceeding."); 21 Charles A. Wright & Kenneth W. Graham, Jr., Fed. Prac. & Proced., § 5110, at 522 (1977) ("courts have always taken judicial notice of facts in ruling on demurrers and motions to dismiss").

### B. *Motion To Amend Standard*

Recognizing the deficiencies of at least some of his claims, and the force of defendants' arguments on the motion to dismiss, Cerasani has cross-moved to amend his amended complaint. Rule 15(a) directs that leave to amend "shall be freely granted when justice so requires," and as a general matter amendments are favored in order "to facilitate a proper decision on the merits." *Conley v. Gibson,* 355 U.S. 41, 48, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *see also Quaratino v. Tiffany & Co.,* 71 F.3d 58, 66 (2d Cir.1995) (citing *Bornholdt v. Brady,* 869 F.2d 57, 68 (2d Cir.1989)). The decision to grant leave to amend falls within the sound discretion of the trial court. *See Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 330, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971). The district court may deny leave where it would be prejudicial to allow a plaintiff to add claims or the claims would fail to state a claim upon which relief can be granted. *See Lupowitz, Inc. v. Eclipse Holdings, Inc.,* No. 94 Civ. 2916, 1996 WL 285363 (S.D.N.Y. May 30, 1996), *aff'd,* 108 F.3d 1370 (2d Cir.1997); *Cohen v. Reed,* 868 F.Supp. 489, 497 (E.D.N.Y. 1994).

With these standards in mind, I turn first to defendants' motion to dismiss. Where Cerasani's amended complaint falls short, I will consider whether his proposed amended claims state a claim or whether such amendment would be futile.

### C. *Defendants' Motion to Dismiss*

#### 1. *First Cause of Action—Defamation By Negligent Republication of the Pre–Release Film*

In his first cause of action, Cerasani maintains that defendants negligently permitted the unauthorized videotaping of the pre-release film, resulting in damage to his reputa-tion and libel *per se.* (Am. Compl. at ¶¶ 46–48). Cerasani alleges that the pre-release version of the film depicts a character named John "Boobie" Cerasani committing various criminal acts, none of which the real Cerasani committed. (*Id.* at ¶¶ 21–29, 43–44). The criminal acts depicted consist of vicious assaults and murders, more fully described above. Cerasani further alleges that during a screening of the pre-release film, an audience member videotaped the film, and that the film was then "widely disseminated to third parties." (*Id.* at ¶¶ 30–32).

Cerasani's first cause of action does not contend that he was libeled by the pre-release screening itself, but rather that he was defamed as a result of the unauthorized republication of the videotape of the unreleased film, which was made possible by defendants' negligence. The problem with Cerasani's theory is that "[t]he action of libel is not based upon neglect of duty, but is for a positive tort ...." *Folwell v. Miller,* 145 F. 495, 497 (2d Cir.1906); *see also Davis v. Costa–Gavras,* 580 F.Supp. 1082, 1099 (S.D.N.Y.1984) ("lack of creative control or authority for the [republished works] ... preclude plaintiffs' claims against [book's author]"). Where a defendant has no "actual part in composing or publishing," he cannot be held liable "without disregarding the settled rule of law by which no man is bound for the tortious act of another over whom he has not a master's power of control." *Folwell,* 145 F. at 497.

Thus, a libel plaintiff must allege that the party had authority or control over, or somehow ratified or approved, the republication. *See, e.g., Davis,* 580 F.Supp. at 1096–97 (author of purportedly non-fiction paperback book not liable for republication, over which he had no control, of same material in reissued paperback form, regardless of "foreseeability"); *Rinaldi v. Viking Penguin, Inc.,* 52 N.Y.2d 422, 438 N.Y.S.2d 496, 501, 420 N.E.2d 377 (Ct.App.1981) (authors of hardcover book who had no knowledge of and played no role in republication in paperback edition not liable for such republication); *Karaduman v. Newsday, Inc.,* 51 N.Y.2d 531, 435 N.Y.S.2d 556, 561, 416 N.E.2d 557 (Ct. App.1980) (reporters who authored newspa-

per articles not liable for republication absent "concrete evidence of . . . involvement in the republication"). Cerasani has not alleged that defendants authorized or approved the videotaping and distribution of the pre-release film. Nor would it make sense for the defendants, who have an obvious interest in the commercial success of the film, to promote the distribution of bootleg copies of their unfinished film. Accordingly, Cerasani's first cause of action fails as a matter of law and must be dismissed. The allegation that defendants negligently permitted the videotaping of the pre-release version of the film persists in the proposed second amended complaint. To the extent Cerasani moves to amend his complaint to maintain this negligence theory, the motion is denied.

◼ The first cause of action in Cerasani's proposed Second Amended Complaint also alleges that he was defamed by the publication of the pre-release film to the attendees at the screening. (Proposed Second Am. Compl. ¶ 47). Under New York law, "every distinct publication of a libelous writing or a slanderous statement gives rise to a separate cause of action." *Pruiss v. Bosse*, 912 F.Supp. 104, 106 (S.D.N.Y.1996) (citations omitted). Even assuming this allegation sufficiently states a separate claim for defamation, because I hold, as discussed below, that Cerasani is libel-proof, the cross-motion for leave to amend in this respect is denied in any event.

### 2. Second Cause of Action—Defamation By the Released Film

In his second cause of action, Cerasani alleges that the publicly released version of the film portrays him committing the same violent assaults and murders as depicted in the pre-release film. (Am.Compl.¶ 52). While the character in the released film about whom Cerasani complains is named "Paulie," Cerasani claims that he is easily identified as the "Paulie" character because of the character's relationship to Sonny Black, and because not all of the references to Cerasani's name were deleted from the released film. (*Id.* at ¶¶ 50–51).

Defendants argue that Cerasani's libel claim is deficient and must be dismissed because Cerasani: (a) is "libel-proof" as a matter of law; (b) fails adequately to allege that the film falsely portrays his "participation" in the murder of the Captains of the Bonanno Family; and (c) cannot reasonably allege that the truck hijacking scene about which he complains is "of and concerning" him.

### a. Is Cerasani Libel–Proof?

#### (1) The Legal Standards

◼ The Second Circuit has held that "a plaintiff's reputation with respect to a specific subject may be so badly tarnished that he cannot be further injured by allegedly false statements on that subject." *Guccione v. Hustler Magazine, Inc.*, 800 F.2d 298, 303 (2d Cir.1986), *cert. denied*, 479 U.S. 1091, 107 S.Ct. 1303, 94 L.Ed.2d 158 (1987); *see also Cardillo v. Doubleday & Co., Inc.*, 518 F.2d 638, 639 (2d Cir.1975). Under the libel-proof plaintiff doctrine, if there is little or no harm to a plaintiff's already low reputation, then the statements are not actionable. *See Herbert v. Lando*, 781 F.2d 298, 311 & n. 9 (2d Cir.), *cert. denied*, 476 U.S. 1182, 106 S.Ct. 2916, 91 L.Ed.2d 545 (1986). The Second Circuit has provided that in such cases, "even nominal damages are not to be awarded." Rather, "the claim should be dismissed so that the costs of defending against the claim of libel, which can themselves impair vigorous freedom of expression, will be avoided." *Guccione*, 800 F.2d at 303; *see also Cardillo*, 518 F.2d at 640 ("With Cardillo himself having a record and relationships or associations like these, we cannot envisage any jury awarding, or court sustaining, an award under any circumstances for more than a few cents' damages.").

◼ At the same time, the Second Circuit has cautioned that "[t]he libel-proof plaintiff doctrine is to be applied with caution, since few plaintiffs will have so bad a reputation that they are not entitled to obtain redress for defamatory statements . . . ." *Guccione*, 800 F.2d at 303; *see also Buckley v. Littell*, 539 F.2d 882, 889 (2d Cir.1976) (confining the "limited, narrow" libel-proof doctrine to the "basic factual context" of the *Cardillo* case that first enunciated this defense), *cert. denied*, 429 U.S. 1062, 97 S.Ct. 785, 50 L.Ed.2d 777 (1977); *Sharon v. Time,*

*Inc.,* 575 F.Supp. 1162, 1171–72 (S.D.N.Y. 1983) (rejecting application of libel-proof doctrine on the particular facts at issue). While the doctrine has been invoked most frequently on the basis of criminal convictions, *see, e.g., Ray v. Time, Inc.,* 452 F.Supp. 618, 622 (W.D.Tenn.1976), *aff'd,* 582 F.2d 1280 (6th Cir.1978); *Cardillo,* 518 F.2d at 639–40; *Logan v. District of Columbia,* 447 F.Supp. 1328, 1331–32 (D.D.C.1978), the doctrine is not limited to plaintiffs with criminal records. *See Guccione,* 800 F.2d at 303 (Guccione's reputation regarding adultery rendered him libel-proof); *Wynberg v. National Enquirer, Inc.,* 564 F.Supp. 924, 928–29 (C.D.Cal.1982) (plaintiff's reputation for taking financial advantage of Elizabeth Taylor, in addition to convictions related to his treatment of women in general, rendered him libel-proof); *see also Sharon,* 575 F.Supp. at 1171 (discussing "profound reputational effects" of criminal convictions).

### (2) *Cerasani's Reputation*

■ Here, defendants essentially make two arguments. First, they argue that Cerasani's reputation as a habitual criminal and Mafia associate is so damaged that it cannot be further injured. Defendants rely on (a) Cerasani's criminal record, (b) the publication and widespread dissemination of the book's depiction of Cerasani as a Bonanno Family career criminal, (c) Agent Pistone's testimony at the trial in *United States v. Napolitano* about Cerasani's alleged involvement in the murders of three Bonanno captains, and (d) national news coverage of Cerasani's involvement in criminal activity, including recent widespread press coverage of his alleged involvement in a Mafia scheme to manipulate the stock market.

■ Second, defendants argue that Cerasani's reputation with respect to his participation in certain violent acts depicted in the film is so damaged that it cannot be further injured. To establish Cerasani's reputation for these specific acts of brutality, defendants rely on the description in the book of Cerasani's committing such acts, Agent Pistone's trial testimony, and media coverage of the trial. Defendants underscore their argument by pointing out that Cerasani has never sued the authors or publishers of the book for defamation.[1]

Cerasani contends that the "sting" of the alleged defamation by defendants is that he committed certain brutal beatings and vicious murders, not simply that he is a convicted felon or a "known Mafia associate." As to those specific acts, Cerasani relies on his acquittal in *Napolitano.* Accordingly, Cerasani argues that there is no basis here for application of the libel-proof plaintiff doctrine, since he is not disreputable with respect to the specific subject matter at issue.

■ It is clear that Cerasani's reputation is tarnished. Under Federal Rule of Evidence 201, this Court can, and does, take judicial notice of Cerasani's criminal record. *See Ives Lab., Inc. v. Darby Drug Co.,* 638 F.2d 538, 544 n. 8 (2d Cir.1981), *rev'd on other grounds sub nom. Inwood Laboratories, Inc. v. Ives Laboratories, Inc.,* 456 U.S. 844, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982) (taking judicial notice of return of indictments); *Miller v. News Syndicate Co.,* 445 F.2d 356, 357 n. 1 (2d Cir.1971) (in defamation action, court took judicial notice of court proceedings that led to plaintiff's acquittal of criminal charges referred to in allegedly defamatory publication); *see also Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc.,* 969

---

**1.** Under the single publication rule, "where a single impression or printing is used, there is only one publication, regardless of the number of copies sold or the number of people exposed to the libel." *Rinaldi v. Viking Penguin, Inc.,* 101 Misc.2d 928, 422 N.Y.S.2d 552, 555 (N.Y.Sup. 1979), *aff'd as modified,* 52 N.Y.2d 422, 438 N.Y.S.2d 496, 420 N.E.2d 377 (Ct.App.1981); *see Gregoire v. G.P. Putnam's Sons,* 298 N.Y. 119, 120, 81 N.E.2d 45 (Ct.App.1948); *Ferber v. Citicorp Mortgage, Inc.,* No. 94 Civ. 3038, 1996 WL 46874, at *4–5 (S.D.N.Y. Feb.6, 1996). If a writing is later reissued or republished, however, the

statute of limitations with respect to that reissue or republication commences to run anew. *See Rinaldi v. Viking Penguin, Inc.,* 73 A.D.2d 43, 425 N.Y.S.2d 101, 102–03 (1st Dep't 1980), *aff'd,* 71 A.D.2d 411, 422 N.Y.S.2d 426, 428 (1979); *see also Karaduman v. Newsday, Inc.,* 71 A.D.2d 411, 422 N.Y.S.2d 426, 428 (1st Dep't 1979). Here, the distribution of the movie constitutes a separate publication from the publication of the book. Cerasani's failure to sue the book's author and publisher for defamation does not preclude this suit over a later publication.

F.2d 1384, 1388 (2d Cir.1992) ("[a] court may take judicial notice of a document filed in another court 'not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings'") (citation omitted); *Kowalski v. Gagne*, 914 F.2d 299, 305–06 (1st Cir. 1990) (court may take judicial notice of convictions and proceedings in other courts); *Commodity Futures Trading Comm'n v. Co Petro Mktg. Group, Inc.*, 680 F.2d 573, 584 (9th Cir.1982) (taking judicial notice of criminal conviction).

Cerasani is a convicted racketeer, Mafia associate, bank robber, and drug dealer. He is also under indictment for his alleged participation in an organized crime scheme to manipulate the stock market, including through extortion by threats of violence. The fact of his acquittal in the *Napolitano* trial, where the burden of proof is obviously much higher than in a civil proceeding, does not restore his damaged reputation. Nor does it even mean that it is not more likely than not that he committed the violent acts depicted in the film. The fact of acquittal simply means that the government did not prove beyond a reasonable doubt that Cerasani committed the crimes charged.

■■■■■■ It is equally clear that Agent Pistone's account of Cerasani's violent, criminal conduct as a member of Sonny Black's crew, including drug trafficking, illegal weapons possession, loansharking and murder, has been widely disseminated. Pistone testified about those acts in the 1982 trial of *United States v. Napolitano,*[2] and described them in the 1987 publication and the 1997 republication in paperback of the book. It is somewhat incredible that Cerasani ignored the publication of a book that purported to tell

the "true story" of his role as "right-hand man" of Sonny Black, and which described his alleged participation in numerous crimes ranging from loansharking to drug trafficking to murder, but now complains when a fictionalized version of the story is made into a motion picture. In addition, the media covered the trial closely. Pistone's gripping testimony about the great strength demonstrated by Cerasani in moving Big Trin's corpse was widely covered in the press.[3]

The Court reviewed the pre-release and final versions of the film, mindful of Cerasani's criminal record and his well-publicized reputation for having committed the violent acts at issue. Neither version of the film portrays Cerasani or "Paulie" engaged in conduct notably worse than that described by Agent Pistone from the witness stand, depicted in the book, and publicized by the press, and no reasonable jury could conclude otherwise. In particular, I note that the film does not depict Cerasani or "Paulie" personally killing anyone. Rather, the murder scene is consistent with Pistone's trial testimony, the book, and the media coverage.

In light of all the circumstances, I am persuaded that Cerasani is libel-proof as a matter of law with respect to the depiction in the film of his participation in certain violent acts, including the Mafia murders. Cerasani is generally reputed to be an associate of organized crime. He has committed serious crimes. While he was not convicted in the *Napolitano* trial, accounts of his participation in the acts depicted in the film have been widely disseminated since 1982. Cerasani's reputation is sufficiently tarnished that at most he could collect nominal damages, even assuming he could overcome the tremendous legal hurdles before him in this case. In

---

**2.** This Court takes judicial notice of the *Napolitano* trial testimony, including those excerpts detailed earlier in this opinion. *See Liberty Mutual,* 969 F.2d at 1388; *see also* Fed.R.Evid. 201(b). This court is obviously not taking judicial notice of that testimony for the truth of the matters asserted, but rather "to establish the fact of such litigation and related filings." *See Kramer v. Time Warner Inc.,* 937 F.2d 767, 774 (2d Cir. 1991).

**3.** This Court also takes judicial notice of the widespread newspaper coverage of the *Napolita-*

*no* trial. *See Comas v. Merrill Lynch & Co.,* No. 92 Civ. 6560, 1993 WL 800778, at *4 n. 2 (S.D.N.Y. July 2, 1993) (taking judicial notice of fact that stock prices were listed daily in the Wall Street Journal); *Korwek v. Hunt,* 646 F.Supp. 953, 958 (S.D.N.Y.1986) (taking judicial notice of substantial media coverage), *aff'd,* 827 F.2d 874 (2d Cir.1987); *Show–World Center, Inc. v. Walsh,* 438 F.Supp. 642, 655 (S.D.N.Y.1977) (taking judicial notice of widespread publicity via newspaper and television news).

view of the Second Circuit's analysis in *Guccione* and *Cardillo,* I therefore find Cerasani to be the exceptional, libel-proof plaintiff.

**b. *Has Cerasani Sufficiently Alleged The Falsity of the Film's Murder Scene?***

■ Even assuming that Cerasani is not libel-proof, defendants argue that his libel claim with respect to the murder scene fails as a matter of law because he has failed to allege adequately that the scene contains any false or defamatory assertions of fact. Specifically, defendants argue that the film depicts the "Paulie" character as a bystander, present at the murder scene, who carried and dismembered the bloody corpse of one murder victim. According to defendants, Cerasani has, artfully, *not* alleged that the murder scene is defamatory in depicting his presence at the murder scene and his participation in the dismemberment. He has, defendants contend, limited his allegation to a denial that he actually committed the murder, which is irrelevant to the scene as depicted in the film. Cerasani argues that the clear inference from the murder scene in the film is that he was actually involved in the killings themselves, and that he has unambiguously denied any such role.

Cerasani alleges in his amended complaint as follows:

> Yet another criminal act which the "Boobie" character is portrayed as participating in is the commission of a vicious murder of a key organized crime figure named Big Trin, as well as two additional organized crime figures. This murder scene is particularly gruesome. In it, the top of one victim's skull is shown being blown off with blood and brain-matter flying everywhere. Yet another victim is shown with flesh being torn off his side by a gun shot, leaving a gaping hole and blood pouring out. After the murder, the "Boobie" character goes out to the car where Brasco is waiting and brings him to the basement where the murders were committed. He then hands Brasco a large saw-like knife which is then used to dismember the body of at least one victim.

(Am.Compl.¶ 27). In the next paragraph of his complaint, Cerasani alleges that "[a]s regards plaintiff, the murder scene is entirely false. Plaintiff did not murder an organized crime figure named 'Big Trin.' Plaintiff has never committed or been charged with murder." (*Id.* at ¶ 28).

Cerasani's amended complaint alleges that he never actually killed anyone, but does not deny that Cerasani was present at the murder scene or that he participated in dismembering a body. The statement "as regards plaintiff, the murder scene is entirely false" is ambiguous and does nothing to clarify Cerasani's role in this criminal act. The film, however, does not depict the Cerasani or "Paulie" character actually killing anyone. No such inference is warranted from what is depicted. Accordingly, Cerasani has failed to allege any false or defamatory assertion of fact. I dismiss Cerasani's defamation claim with respect to the murder scene on this basis as well.

**c. *Is The Hijacking Scene "Of and Concerning" Cerasani?***

■ Hornbook libel law requires that an allegedly defamatory statement must be "of and concerning" a particular individual. *See, e.g., Fetler v. Houghton Mifflin Co.,* 364 F.2d 650, 651–53 (2d Cir.1966). A complaint must be dismissed where this requirement is not satisfied. *See Anyanwu v. Columbia Broadcasting Sys., Inc.,* 887 F.Supp. 690, 692 (S.D.N.Y.1995); *Church of Scientology Int'l v. Time Warner Inc.,* 806 F.Supp. 1157, 1159–60 (S.D.N.Y.1992).

■ Here, Cerasani alleges that he is "implicated [] by inference [in] the vicious beating of a driver during a truck hijacking." (Am.Compl.¶ 23). In this truck-hijacking scene, approximately six men, all clad in black, are depicted running around the targeted truck. Sonny Black and one of the masked men are depicted kicking the truck driver. This scene is part of a montage in which various crimes committed by Sonny Black are juxtaposed in rapid succession with scenes of Sonny Black partying at a nightclub. Although Cerasani admits that all of the characters in this hijacking scene except Sonny Black appear in the film "wearing ski masks and do not remove them," Cerasani nevertheless alleges that "the portrayal of Sony Black committing a crime with individu-

als whose faces are covered is sufficient to infer the participation of the ['Paulie'] character in the hijacking" because the "Paulie" character is portrayed in the film "as one of Sonny Black's right-hand men" who "participates in all of Sonny Black's illicit activities." (*Id.*). The inference Cerasani draws is not a reasonable one.

First, in the crime scene immediately following the truck-hijacking, Sonny Black is depicted robbing a clothing warehouse with three other men, none of whom is the "Paulie" character. Thus, a viewer could not reasonably conclude that "Paulie" participates in *all* of Sonny Black's criminal activities. Second, there is no distinguishing voice, clothing, physical appearance, or other feature that would identify any of the masked truck-hijackers as "Paulie." Finally, I note that plaintiff offers no opposition in his motion papers to defendants' motion to dismiss this claim. Accordingly, even assuming Cerasani is not libel-proof, defendants' motion to dismiss this claim is granted on this independent basis as well.

### 3. *Third Cause of Action—New York Civil Rights Law § 51*

#### a. *Cerasani's Present § 51 Claim Based on the Released Film*

Cerasani's third cause of action pursuant to New York Civil Rights Law § 51 [4] alleges that the released film "features a character readily identifiable with plaintiff [and] exploits his identity for commercial gain and as such is used for purposes of trade." (Am. Compl.¶ 58). Plaintiff offers no opposition to defendants' motion to dismiss his § 51 claim. Instead, he volunteers to withdraw this claim if permitted to amend his amended complaint to state a § 51 claim with respect to the pre-release film. Defendants contend that plaintiff's present claim must be dismissed and that any amendment would be futile.

To state a claim under § 51, a plaintiff must prove three elements: (1) defendants used his name, portrait, picture, or voice (2) for purposes of trade or advertising, (3) without his written consent. *See Groden v. Random House, Inc.*, No. 94 Civ. 1074, 1994 WL 455555, at *2 (S.D.N.Y. Aug.23, 1994) (citing *Cohen v. Herbal Concepts, Inc.*, 63 N.Y.2d 379, 482 N.Y.S.2d 457, 459, 472 N.E.2d 307 (Ct.App.1984)), *aff'd*, 61 F.3d 1045 (2d Cir.1995). These provisions must be construed narrowly. *See Rand v. Hearst Corp.*, 31 A.D.2d 406, 298 N.Y.S.2d 405, 410 (1st Dep't 1969), *aff'd*, 26 N.Y.2d 806, 309 N.Y.S.2d 348, 257 N.E.2d 895 (Ct.App.1970). It is clear that Cerasani's present § 51 claim must be dismissed. A § 51 plaintiff must allege the improper use of that individual's "name, portrait, picture or voice," and courts have repeatedly dismissed claims premised on the use of a fictitious rather than actual name. *See, e.g., Wojtowicz v. Delacorte Press*, 58 A.D.2d 45, 395 N.Y.S.2d 205, 207 (1st Dep't 1977) (depiction of plaintiffs under fictitious names in film "Dog Day Afternoon" fails to state a claim under § 51), *aff'd*, 43 N.Y.2d 858, 403 N.Y.S.2d 218, 374 N.E.2d 129 (Ct.App.1978); *Waters v. Moore*, 70 Misc.2d 372, 334 N.Y.S.2d 428, 433 (N.Y.Sup. Ct.1972) (depiction of plaintiff's character under a fictitious name in film "The French Connection" fails to state a § 51 claim, regardless of whether plaintiff's "identity can be ascertained from his involvement with the actual event [depicted in the film] or by reference to external sources"); *Springer v. Viking Press*, 90 A.D.2d 315, 457 N.Y.S.2d 246, 248 (1st Dep't 1982) (no § 51 cause of action exists even where character in book was based on plaintiff and used her given, but not last, name), *aff'd*, 60 N.Y.2d 916, 470 N.Y.S.2d 579, 458 N.E.2d 1256 (Ct.App.1983). Accordingly, even assuming Cerasani is identifiable as "Paulie," his claim under § 51 must be dismissed.

---

4. Cerasani intended to sue under New York Civil Rights Law § 51, which provides:

Any person whose name, portrait, picture or voice is used within this state for advertising purposes or for the purposes of trade without the written consent first obtained ... may maintain an equitable action ... against the person, firm or corporation so using his name, portrait, picture or voice ....

New York Civil Rights Law § 51 (McKinney 1992 & 1997 Supp.). Section 50, which plaintiff erroneously cites, makes such unauthorized use a misdemeanor. *Id.* § 50.

### b. *Cerasani's Proposed § 51 Claim Based on the Pre–Release Film*

Cerasani proposes to amend his amended complaint to add a § 51 claim with respect to the pre-release film, which referred to Cerasani several times by his nickname "Boobie," and a few times by his given name. Defendants contend that such amendment would be futile because he cannot establish a wrongful use of his name "for purposes of trade" as required under § 51. Cerasani claims that the pre-release screening was for such "trade purposes" because it was undertaken to gauge audience reaction to the film "in order to enhance its consumer appeal, and hence its marketability." (Proposed Second Am. Compl. ¶ 22).

A claim with respect to the pre-release film would satisfy the first and third elements of § 51. As to the second element, Cerasani has not argued that his name was misappropriated for "advertising purposes," nor could he. Thus, Cerasani can only state a § 51 claim if his name was misappropriated for "purposes of trade."

▮▮▮ The term "purposes of trade" is "not susceptible to ready definition." *Davis v. High Society Magazine, Inc.,* 90 A.D.2d 374, 457 N.Y.S.2d 308, 313 (2d Dep't 1982). The fact that the publication or use of a name or picture is spurred by a profit motive or included to encourage sales or distribution of the publication is a necessary, but hardly a sufficient, ingredient in determining the existence of a trade purpose. *See Arrington v. New York Times Co.,* 55 N.Y.2d 433, 449 N.Y.S.2d 941, 944, 434 N.E.2d 1319 (Ct.App. 1982), *cert. denied,* 459 U.S. 1146, 103 S.Ct. 787, 74 L.Ed.2d 994 (1983). Cerasani stumbles on this initial requirement. While there can be no doubt that defendants created the movie to make a profit, defendants screened the pre-release film for a much more limited purpose, namely to obtain a preliminary audience response to the movie to assist the filmmakers in creating a better, final product.

The Appellate Division, Third Department has held that a film screening, without charge, does not constitute a use for "advertising·purposes or for the purpose of trade"

under § 51. *See McGraw v. Watkins,* 49 A.D.2d 958, 373 N.Y.S.2d 663, 665 (3d Dep't 1975). In *McGraw,* a plaintiff sued a filmmaker under § 51 for depicting her in the nude, without her consent, in his film. Plaintiff alleged that the filmmaker had publicized and exhibited the film to many people, that "the purpose of producing it was to enhance the financial interest of defendant and that defendant intends to exhibit the film at the Film Festival at Cannes, France in the hope of obtaining financial backing for its production throughout the United States and Europe." *Id.* at 664. The court held that, notwithstanding defendant's ultimate profit motive, where plaintiff did not allege "that defendant made a charge for any of the alleged exhibitions of the film .... the alleged use of plaintiff's picture by defendant was not for advertising purposes or for the purposes of trade and, therefore, it is not within the statute's prohibitive provisions." *Id.* at 665.

Like McGraw, Cerasani cannot allege that defendants charged any fee or generated any revenue through the pre-release screening. Any ultimate profit motive was clearly secondary to the creative and editorial purposes of the screening. Thus, the proposed § 51 claim would fail as a matter of law. In light of the futility of an amendment to add such a claim, the motion to amend is denied with respect to this claim as well.

▮▮▮ Finally, to the extent plaintiff purports to assert a claim that the film portrays him in a "false light," that claim must be dismissed. New York·does not recognize any such false light claim. *See, e.g., Howell v. New York Post Co., Inc.,* 81 N.Y.2d 115, 596 N.Y.S.2d 350, 354, 612 N.E.2d 699 (Ct. App.1993) (holding that New York law has no common law right of privacy embracing such claims as "false light," as any such privacy right is purely statutory); *Freeman v. Johnston,* 192 A.D.2d 250, 601 N.Y.S.2d 606, 607 (1st Dep't 1993) (affirming dismissal of "false light" claim because "New York law applies to such a claim and this State does not recognize such a tort"), *aff'd,* 84 N.Y.2d 52, 614 N.Y.S.2d 377, 637 N.E.2d 268 (Ct.App. 1994).

**CONCLUSION**

For the foregoing reasons, defendants' motion to dismiss is granted. Plaintiff's cross-motion for leave to amend his amended complaint is denied on grounds of futility. The Clerk of the Court shall enter judgment for the defendants dismissing the complaint.

SO ORDERED.