OPINION OF THE COURT
Bentley Kassal, J.
ISSUE
Does the publication of a paperback edition of a book after notice that the original hard-cover edition contained allegedly libelous material constitute a new and separate act of defamation? The resolution of this issue, for which there appears to be no reported authority, is crucial to the determination of two aspects of this case:
(1) was the action timely under the Statute of Limitations, and
(2) did the defendant act with malice in republishing the alleged untrue statements in the paperback edition?
MOTIONS
This is a motion by defendants for summary judgment pursuant to CPLR 3212 dismissing the complaint on the grounds that (1) the action is barred by the Statute of Limitations, and (2) there are no triable issues of fact. Plaintiff has *930 cross-moved to dismiss defendants’ affirmative defense of Statute of Limitations.
FACTS
The principal protagonists in this matter are no strangers to each other or to the courts. The plaintiff Dominic S. Rináldi is a former Justice of the Supreme Court of the State of New York. The defendant Jack Newfield is an investigative journalist, who has been writing about incompetence and corruption in the State judicial system since 1972. In the course of his study of the judiciary, Newfield has written several newspaper and magazine articles and at least two books mentioning the plaintiff. One of those books, The Abuse of Power, coauthored with the defendant Paul Du Brul and published by the defendant Viking Penguin, Inc., is the subject of the present action. These writings have resulted in several defamation actions in the past by plaintiff against Newfield, his collaborators, publishers and an advertising agency. In no small measure those actions have established the law in this State with respect to the defamation of a public figure (and apparently, are destined to continue to do so). (See, generally, Rinaldi v Holt, Rinehart & Winston, 53 AD2d 839, revd 42 NY2d 369, cert den 434 US 969; Rinaldi v Village Voice, 47 AD2d 180, cert den 423 US 883.)
On May 13, 1977, The Abuse of Power was released in hard cover to the general public. At that time, although 20,000 copies of the book had been printed and prepared for binding, only about 14,000 were actually bound and approximately 10,000 distributed to retailers. One week later, plaintiff wrote Viking the first in a series of four letters, protesting the veracity of the following statements contained in a section of the book dealing with "Organized crime’s domination of New York City’s politics and judges”: "Individual mobsters have had access to individual politicians and judges * * * Supreme Court Justice Dominic Rinaldi has twice personally gone to police stations to release alleged Mafioso Santo Patti, who had twenty prior gambling arrests, rather than wait for Patti to be arraigned before another judge the next morning. Police records show that Justice Rinaldi did this on April 18, 1969, and again on June 15, 1970. But no crime has ever been proven against Corso or Rinaldi.”
In his letters to the publisher, plaintiff claimed, inter alia, *931 that he did not know Patti, had never been to a police station to sign a release or a bail bond and that no support for defendants’ claims existed in police records. He also detailed the normal bail procedures at the Supreme Court which were followed. Plaintiff demanded a retraction, the printing and insertion of an erratum label in every unissued copy of the first printing and also the elimination of the statements in their entirety from all future publications of the book, both hard and soft cover. Fully aware of the requisite heavy burden in proving malice with regard to the original hard-cover publication (see Rinaldi v Holt, Rinehart & Winston, supra), he did not commence an action for defamation but merely sought to put the defendants on notice of the alleged falsity of the information they had published. This was allegedly done to establish a foundation in the event of a subsequent publication.
In response, Viking agreed after discussion with Newfield, only to rewrite one sentence of the languáge constituting the alleged libel in all subsequent printings deleting any reference to plaintiff going to the police station. Viking claimed that the offer was made solely as a courtesy to plaintiff because a review of the New York Times article on which Newfield had based the statement appeared to confirm such an "inference”. Plaintiff rejected the Viking-Newfield proposal, stating that such a change would not eliminate the impression of impropriety on his part. Nonetheless, Viking claims a note was inserted in their files so that the first sentence would be rewritten in any future printings.* In plaintiff’s letters, he stated that Viking now knew the facts and, therefore, the falsity of the claims, and that, as a result, defendants should not, in the future, rely on the New York Times article.
When hard-cover sales of the book proved to be less successful than anticipated, Viking ordered the printer to bind the remaining unbound sheets in paper covers (approximately 5,400 books) which would sell for $4.95 rather than $12.50. In addition, approximately 4,000 hard-cover copies, stored in Viking’s warehouse, were stripped of their hard cover and rebound as paperbacks. To reflect the change from hard to soft cover, both the title page and its reverse side, the copyright page, were extensively revised.
*932 CHANGES MADE IN THE PAPERBACK
Several other significant revisions were made in addition to the cover. These included the following:
(1) The name of the publisher was changed from "The Viking Press” to "Penguin Books” (a trade name or imprint under which Viking publishes paperback books).
(2) The date of publication was updated from 1977 to 1978 so that the revision reads: "First published in the United States of America by The Viking Press 1977 Published in Penguin Books 1978”.
(3) Various identifying numbers were changed, including The Library of Congress cataloging numbers.
(4) The copyright page of the paperback book indicates that the new edition is published by Penguin Books, Ltd., England; Penguin Books, New York; Penguin Books, Australia; Penguin Books, Canada, Ltd; and Penguin Books (N.Z.), Ltd. These names did not appear in the original hard-cover edition.
(5) The soft-cover book in issue consists of several "signatures” which are groups or packets of 32 pages which are collated as a unit and then bound together to form the book. In order to change the title page of the previously unbound copies, the entire first "signature” was reprinted because it was less expensive to do this than to manually substitute the individual pages. However, in the 4,000 copies, rebound as paperbacks, the first two pages were cut out by hand and the revisions were glued in their place. Again, the procedure was apparently dictated solely by economics.
parties’ contentions regarding second publication
Plaintiff contends, and defendant Viking denies, that the issuance of the paperback copies of The Abuse of Power in 1978 constitutes a separate and distinct publication from the hard-cover edition published in 1977. This is crucial since this action, commenced on July 28, 1978, would be barred by the one-year Statute of Limitations (CPLR 215) unless the issuance of the paperback edition in 1978 constituted an independent actionable tort, namely, a new publication of alleged defamatory material.
DISCUSSION OF THE LAW
A brief review of the relevant law is helpful. Under the *933 common law, each communication or copy of the defamatory material gave rise to a separate cause of action, resulting in a multiplicity of suits and an unending Statute of Limitations, recommencing with each repetition of the libel. In New York, as in many jurisdictions, this "multiple publication rule” has been abandoned in favor of the "single publication rule” which provides that where a single impression or printing is used, there is only one publication, regardless of the number of copies sold or the number of people exposed to the libel. (Gregoire v Putnam’s Sons, 298 NY 119, 126.)
The purpose of this rule is to prevent a multiplicity of unnecessarily vexatious suits against a publisher, especially after a book has left the possession of the publisher, has been placed in the stream of commerce and is exclusively under the control of wholesale distributors and retail outlets. (See, generally, Restatement, Torts 2d, § 577A, subd 3.) Without such a rule, every retail sale of the book at any local outlet would give rise to a new cause of action. However, the rule was not intended to shield a publisher from liability for later, independent publishing acts.
Thus, while future releases of the same issue or edition do not constitute separate actionable wrongs (Gregoire v Putnam’s Sons, supra), a reprint or a new edition of the book has been held to constitute a separate and distinct publication, affording a new cause of action and the concordant renewal of the Statute of Limitations. (Dodd v Harper & Bros., 3 AD2d 548, app dsmd 4 NY2d 958; Wheeler v Dell Pub. Co., 300 F2d 372.)
APPLICATION TO CASE AT BAR
It is clear that the release in 1978 of the soft-cover edition of this book was a new publication of the allegedly libelous material. " 'The test of whether the article is a republication or a repetition should not depend on an interval of time, or a separate sale but upon the answer to the question. Was the act of the defendant a conscious independent one? The individual who sends the same letter to different persons at the same or another time, consciously and intentionally and independently does so. Each separate mailing is a separate conscious act * * * [I]n the case of a newspaper * * * no conscious intent arises until the defendant consciously as a second edition republishes the article. In each case it is the conscious act which determines.’ ” (Barres v Holt, Rinehart & Winston, *934 131 NJ Super 371, 384, affd 141 NJ Super 563, quoting Seelman, Law of Libel and Slander in New York [1933 ed], p 120; original emphasis.)
Viking’s decision to release The Abuse of Power in paperback was a conscious attempt to reach an entirely new market of readers through a different format at a different price. It is further noteworthy that Viking was in exclusive control of all the unissued copies throughout this period. While these factors are significant, they might not, without more, be enough to create a republication. However, Viking, as noted, made extensive revisions on the first two pages of the book and this fact alone is sufficient to distinguish this case from Gregoire (supra) and other cases cited by defendant. The paperback version was, therefore, not made from a single impression or plate, as defendant claims, and Viking cannot now hide behind the protection of the single publication rule. Clearly, there was a second independent act here and not the continuing effects of one tort.
Viking was repeatedly warned by plaintiff that the book contained untrue and allegedly defamatory statements and indeed placed instructions in its own files to revise any future publications. Nevertheless, Viking took a calculated risk in releasing the paperback books, in the manner stated above, without correcting the alleged libel and their chief motivation, it appears, was a desire to cut financial losses.
By defining the fact pattern here as a republication of the alleged libel, as distinguished from a continuous publication, the critical and controlling factor is that although the books had been printed at one time, when they were released at a subsequent date, almost a year later, they had been substantially modified.
STATUTE OF LIMITATIONS
Because the release of the paperback edition in 1978 of The Abuse of Power constituted a "second” publication of the allegedly libelous material, the cause of action based upon that publication is not barred by the one-year Statute of Limitations (CPLR 215), which would be a bar to the action if based solely on the date of the publication of the hard-cover edition.
Accordingly, plaintiff’s cross motion to dismiss Viking’s first affirmative defense is granted, rendering it unnecessary to *935 reach that part of the motion which seeks the same relief based on equitable estoppel.
DEFAMATION OF A PUBLIC OFFICIAL
A defamatory writing is one which "tends to expose a person to hatred, contempt or aversion, or to induce an evil or unsavory opinion of him in the minds of a substantial number of the community”. (McKinnon v Smith, 52 Misc 2d 349, affd 32 AD2d 615.) Words which charge a crime or professional incompetence (as is the situation in the case at bar) have been held to be libel per se and actionable without any allegation of special damages. (Ideal Pub. Corp. v Creative Features, 59 AD2d 862.) Plaintiff is clearly a public official and he is, therefore, required to meet the very heavy burden of proof enunciated in the landmark case of New York Times Co. v Sullivan (376 US 254). The court there held (pp 279-280) a public official must establish with "convincing clarity” that both a false statement has been made and "that the statement was made with 'actual malice’ — that is with knowledge that it was false or with reckless disregard of whether it was false or not.”
SUMMARY JUDGMENT
The public has a vital interest in full disclosure, discussion of official acts and in a free press unfettered in its ability to investigate and report on issues. The purpose is to inform the citizens of governmental actions. This requires a careful scrutiny of any actions for defamation brought by a public official against a publisher. Due to the potential chilling effect on First Amendment freedoms, the court must err, if at all, on the side of free speech where the question is close and summary judgment becomes the rule rather than the exception. (Hotchner v Castillo-Puche, 551 F2d 910, 913, cert den 434 US 834; Guitar v Westinghouse Elec. Corp., 396 F Supp 1042, 1053, affd 538 F2d 309.) These guidelines are at least as applicable to Judges as they are to other public officials for "Judges are supposed to be men of fortitude, able to thrive in a hardy climate” (Craig v Harney, 331 US 367, 376).
In spite of the court’s natural inclination, wherever possible, to grant summary judgment in defamation actions involving First Amendment questions, there are cases where such relief is totally inappropriate. Certainly here, in view of the notice *936 given by the plaintiff to the defendants that the original publication was inaccurate and defamatory, an issue is raised as to the requisite malice involved in the publication of the paperback edition. (See Curtis Pub. Co. v Butts, 388 US 130; Rinaldi v Village Voice, 47 AD2d 180, 182, supra.) Such an issue alone would preclude summary judgment at this stage.
Further, by making the present motion, the defendants automatically stayed all disclosure in this action before any had even been commenced. (CPLR 3214.) On the papers submitted, the plaintiff has demonstrated that some facts essential to resist the motion for summary judgment may exist but are not producible since he has not had an opportunity for disclosure. Accordingly, denial of the motions would be required, in any event, by CPLR 3212 (subd [f]).
This ruling applies equally to the motions for summary judgment by the publisher and the independent motion by the authors who claim that they had no further involvement after the original publication. In this connection, an examination of the claims of authors Newfield and Du Brul shows that although both disclaim any involvement with the republication, the circumstances surrounding each of these defendants are different. Jack Newfield admits to writing the chapter containing the allegedly libelous statements without Du Brul’s participation, but says he had no input in Viking’s later decision to reissue the book in paperback. The record, however, contains correspondence between Newfield, his attorney and Viking after plaintiff’s letters and prior to the paperback publication. As to Du Brul, he did coauthor the book and he and Newfield signed the contract with Viking giving each author the same rights and liabilities. Accordingly, at this stage it cannot be said that he has no liability for actions involving the book. It may well be that after complete disclosure the authors will be able to establish that neither had sufficient input in the publication of the paperback edition to subject them to liability. At this time, these facts present issues precluding summary judgment until the plaintiff has had an opportunity, through disclosure, to develop the respective roles of the authors in the publishing of the paperback.
Finally, Viking’s claim of a defense under section 74 of the Civil Rights Law appears to be raised as an afterthought, since it is not asserted as an affirmative defense in the answer. In any event, there are triable issues of fact that cannot be determined on the papers as to whether the offen *937 sive statements were protected as a "fair and true” reporting of a judicial proceeding.
The constitutional burdens placed on a public official who seeks to maintain an action for defamation are clearly onerous. Accordingly, as has recently been recognized by the Supreme Court, this burden requires that the public official be given an opportunity to obtain the evidence necessary to establish his claim. (Herbert v Lando, 441 US 153.) On the unique facts demonstrated on this motion, plaintiff should have an opportunity to do so before he is denied his day in court. (Washington Post Co. v Keogh, 365 F2d 965, 976, cert den 385 US 1011.)
Accordingly, the motions are in all respects denied.

 But no revision was made nor was an erratum inserted at any time in any copy of the book.