**James D. NICHOLS, Plaintiff,**

v.

**Michael MOORE, Defendant.**

No. 03–74313.

United States District Court,
E.D. Michigan,
Southern Division.

Sept. 3, 2004.

Stephani C. Godsey, Lansing, MI, for Plaintiff.

Herschel P. Fink, Honigman, Miller, Bingham Farms, MI, Cynthia G. Thomas, Honigman, Miller, Detroit, MI, for Defendant.

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND TO DISMISS

BORMAN, District Judge.

Presently before the Court is Defendant Michael Moore's Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56 (Counts I–IX), and his Motion for Judgment on the Pleadings pursuant to Fed.R.Civ.P. 12(c) (Count X).

Plaintiff James Nichols Complaint, filed on October 27, 2003, contains the following counts:

Count I  Libel Per Se (based upon Defendant's film, "Bowling for Columbine" ("the Film"))

Count II  Libel Per Se (based upon Defendant's appearance on the "Oprah Winfrey Show")

Count III  Defamation by Implication (based upon the Film)

Count IV  Defamation by Implication (based upon the Oprah Winfrey Show)

Count V  False Light Invasion of Privacy (based upon the Film)

Count VI  False Light Invasion of Privacy (based upon the Oprah Winfrey Show)

Count VII  Intentional Infliction of Emotional Distress (based upon the Film)

Count VIII  Intentional Infliction of Emotional Distress (based upon the Oprah Winfrey Show)

Count IX  Negligent Infliction of Emotional Distress

Count X   Right of Publicity

(Complaint).

Defendant's motion pursuant to Fed. R.Civ.P. 56, seeks summary judgment as to claims I through IX "because those claims are barred by the applicable statute of limitations." (Defendant's Motion for Summary Judgment, p. 1). Specifically, Defendant, relying on Michigan's one-year statute of limitations, M.C.L. § 600.5805(9), contends that Plaintiff failed to toll the statute under M.C.L. § 600.5856.

Defendant's motion pursuant to Fed. R.Civ.P. 12(c), seeks dismissal of Count X as barred by the First Amendment.

On July 14, 2004, the Court heard oral argument on the motions, and the Court directed the parties to file a supplemental brief regarding the relevance of the Michigan Legislature's response to the Michigan Supreme Court decision in *Gladych v. New Family Homes, Inc.*, 468 Mich. 594, 664 N.W.2d 705 (2003). On July 21, 2004, the parties filed their supplemental briefs. Because Plaintiff's brief contained, in addition, a discussion of the "Single Publication Rule" that was beyond the scope of the Court's direction, the Court, on August 11, 2004, entered an Order permitting Defendant to file a response to that issue. That brief was filed on August 11, 2004.

## BACKGROUND

On October 28, 2002, the movie Bowling for Columbine premiered in Flint, Michigan, near Decker, the hometown of Plaintiff.[1] (Complaint, ¶ 5). On August 19, 2003, the Film was released on VHS and DVD. The Film is a documentary which explores guns and violence in America. Of particular relevance to this case is a film segment on the bombing of the Federal Building in Oklahoma City, for which Plaintiff's brother Terry Nichols and Timothy McVeigh were arrested and convicted.

At the time of the Oklahoma City bombing, Plaintiff James Nichols was arrested on a charge of possession of explosive devices on his farm, detained, and released on bond. Subsequently, the government dismissed charges against James Nichols due to a lack of evidence.

As to that portion of the Film dealing with the Oklahoma City bombing, Defendant interviewed Plaintiff at his home in Decker, Michigan. The interview lasted approximately three hours; Defendant incorporated approximately ten minutes of the interview into the Film. Plaintiff claims that Defendant did not inform him that he would be using the interview for pecuniary gain in the Film. (Complaint, ¶ 9).

Defendant conducted an ongoing narration throughout the Film. At one point, while the camera showed Plaintiff's home, Defendant Moore stated:

> On this farm in Decker, Michigan, McVeigh and the Nichols brothers made practice bombs before Oklahoma City. Terry and James were both arrested in connection to the bombing. Terry Nichols was convicted and received a life sentence. Timothy McVeigh was executed, but the feds didn't have the goods on James so the charges were dropped.

(Complaint, ¶ 15).

On November 1, 2002, a few days after the Film's release, Defendant appeared on the Oprah Winfrey Show, and made the following statement: "They—McVeigh and Nichols were in the thumb of Michigan living there for a number of months and

---

**1.** The date of release is the subject of contention between the parties. See, *infra,* discussion of the date of publication.

making practice bombs and—in preparation for Oklahoma City." (Complaint, ¶ 18).

On November 26, 2002, Plaintiff's counsel mailed a demand for retraction of the above statements to Defendant's counsel, Andrew Hurwitz in New York City. Hurwitz did not respond to the letter. However, on December 23, 2002, Detroit attorney Herschel Fink responded, refusing to grant the retraction request.

On October 27, 2003, Plaintiff filed the instant action. On October 28, 2003, Plaintiff's counsel contacted Detroit attorney Herschel Fink to inquire as to whether he would accept service on Defendant Moore's behalf. Plaintiff's counsel sent a copy of the Summons and Complaint to Fink via facsimile, asking him to "let [her] know as soon as possible" if he would be "able to accept service on Mr. Moore's behalf." (Plaintiff's Response, Ex. 1). A series of telephone calls ensued, culminating with an October 31, 2003 letter from Fink to Plaintiff's counsel, stating that he could not accept service on Defendant Moore's behalf. Thereafter, on November 5, 2003, Plaintiff's counsel served the Complaint via registered mail on Defendant's personal attorney Andrew Hurwitz in New York. Fink now serves as counsel for Defendant in the instant case.

## ANALYSIS

### A. Standard for Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56, a party against whom a claim, counterclaim, or cross-claim is asserted may "at any time, move with or without supporting affidavits, for a summary judgment in the party's favor as to all or any part thereof." Fed.R.Civ.P. 56(b). Summary judgment is appropriate where the moving party demonstrates that there is no genuine issue of material fact as to the existence of an essential element of the nonmoving party's case on which the nonmoving party would bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477

U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

A fact is "material" for purposes of a motion for summary judgment where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Kendall v. Hoover Co.,* 751 F.2d 171, 174 (6th Cir. 1984) (quoting Black's Law Dictionary 881 (6th ed.1979)) (citations omitted). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Conversely, where a reasonable jury could not find for the non-moving party, there is no genuine issue of material fact for trial. *Id.; Feliciano v. City of Cleveland,* 988 F.2d 649, 654 (6th Cir.1993). In making this evaluation, the court must examine the evidence and draw all reasonable inferences in favor of the non-moving party. *Bender v. Southland Corp.,* 749 F.2d 1205, 1210–1211 (6th Cir. 1984).

If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial" will mandate the entry of summary judgment. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548. The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial. Fed.R.Civ.P. 56(e). The rule requires that non-moving party to introduce "evidence of evidentiary quality" demonstrating the existence of a material fact. *Bailey v. Floyd County Bd. of Educ.,*

106 F.3d 135, 145 (6th Cir.1997); *see also Anderson,* 477 U.S. at 252, 106 S.Ct. 2505 (holding that the non-moving party must produce more than a scintilla of evidence to survive summary judgment).

Summary judgment is particularly appropriate at an early stage in cases where claims of libel or invasion of privacy are made against publications dealing with matters of public interest and concern. "In recognition of the constitutional privilege of free expression secured by the First and Fourteenth Amendments, the courts in libel actions have recognized the need for affording summary relief to defendants in order to avoid the 'chilling effect' on freedom of speech and press." *Ireland v. Edwards,* 230 Mich.App. 607, 613, n. 4, 584 N.W.2d 632 (1998)(quoting *Lins v. Evening News Ass'n,* 129 Mich. App. 419, 425, 342 N.W.2d 573 (1983)).

## B.  Statute Of Limitations

The statute of limitations in Michigan for claims of libel or defamation is one year:

(1) A person shall not bring or maintain an action to recover damages for injuries to persons or property unless, after the claim first accrued to the plaintiff or to someone through whom the plaintiff claims, the action is commenced within the periods of time prescribed by this section.

\*    \*    \*    \*    \*    \*

(9) The period of limitations is 1 year for an action charging libel or slander.

M.C.L. §§ 600.5805(1), (9). Accordingly, Plaintiff's claims for libel per se and defamation by implication, Counts I through IV of the Complaint, are subject to a one-year limitations period.  Defendant argues, however, that Counts V through IX of the Complaint, under Michigan law, should also be subject to the one-year period.  Plaintiff does not contest Defendant's argument.

Defendant has provided no case applying Michigan law expressly stating that claims for invasion of privacy are subject to the one-year limitations period.  Based upon a review of the Michigan cases provided, as well as those from other jurisdictions, the Court finds that Michigan courts would likely apply the one-year limitation period to Plaintiff's claims of invasion of privacy and intentional and negligent infliction of emotional distress.

In *Meyer v. Hubbell,* 117 Mich.App. 699, 324 N.W.2d 139 (1982), the Michigan Court of Appeals found that claims alleging damage to reputation, whatever the label may be, are properly construed as libel claims. The court stated:

[P]laintiff alleged that the perjury and conspiracy to perjure caused damage to his "reputation, credibility, character, business and professional status". Plaintiff alleged no other harm to himself in this pleading which could give rise to an intentional infliction of emotional distress claim.  Since plaintiff's complaint was properly interpreted to allege libel, the trial judge was correct in applying the one-year statute of limitations period to bar the action.

*Id.* at 704–05, 324 N.W.2d 139.  Further, the United States Court of Appeals for the Sixth Circuit has held that claims of invasion of privacy and defamation, under Michigan law, are treated similarly in terms of the defenses available.  The court stated: "[u]nder any circumstances that would give rise to a conditional privilege for the publication of defamation there is likewise a conditional privilege for the invasion of privacy." *Bichler v. Union Bank and Trust Co. of Grand Rapids,* 745 F.2d 1006, 1011 (6th Cir.1984)(quoting *Restatement (Second) of Torts,* § 652G, comment a).

Cases from other jurisdictions considering the issue, although not binding prece-

dent, also lead to the conclusion that the one-year limitations period applies to invasion of privacy and intentional and negligent infliction of emotional distress claims. In *Eastwood v. Cascade Broadcasting Co.*, 106 Wash.2d 466, 722 P.2d 1295, 1299 (1986), the Washington Supreme Court held that a false light invasion of privacy claim was governed by the statute of limitations for libel and slander, based upon the duplication inherent in false light and defamation claims. Similarly, in *West v. Media General Convergence, Inc.*, 53 S.W.3d 640 (Tenn.2001), the Tennessee Supreme Court stated:

> [W]e recognize that application of different statutes of limitation for false light and defamation cases could undermine the effectiveness of limitations on defamation claims. Therefore, we hold that false light claims are subject to the statutes of limitation that apply to libel and slander ...

*Id.* at 648. *See also Grunseth v. Marriott Corp.*, 872 F.Supp. 1069, 1074–75 (D.D.C.1995)(stating that the one-year statute of limitations for libel and slander "has been applied to invasion of privacy claims ... on the rationale that invasion of privacy is essentially a type of defamation.")(citing *Doe v. Southeastern University*, 732 F.Supp. 7, 8 (D.D.C.1990))(applying District of Columbia law). The Court, in reviewing the above-listed cases, determines that Michigan courts would follow a similar logic and apply the one-year limitations period to Plaintiff's claims for invasion of privacy and intentional and negligent infliction of emotional distress because the injury alleged is one to Plaintiff's reputation. Accordingly, the Court finds that Counts I through IX of the Complaint are subject to the one-year limitations period prescribed in M.C.L. § 600.5805(9).

Defendant argues that Plaintiff failed to comply with the statute of limitations by failing to comply with the tolling requirements of M.C.L. § 600.5856. Plaintiff argues that (1) the date upon which the claims arose is a question of fact, (2) Defendant's reading of § 5856 is "hyper technical," (3) M.C.L. § 600.5856 has recently been amended by the Michigan Legislature in direct response to the Michigan Supreme Court's decision in *Gladych*, (4) he complied with the statute because he reasonably believed that Herschel Fink was the attorney for Defendant at the time the Complaint was served, and (5) the release of the Film on VHS and DVD constitutes a republication, restarting the limitations period.

At the time the instant action was initiated, M.C.L. § 600.5856 read:

The statutes of limitations or repose are tolled:

(a) At the time the complaint is filed and a copy of the summons and complaint are served on the defendant.

(b) At the time jurisdiction over the defendant is otherwise acquired.

(c) At the time the complaint is filed and a copy of the summons and complaint in good faith are placed in the hands of an officer for immediate service, but in this case the statute is not tolled longer than 90 days after the copy of the summons and complaint is received by the officer.

(d) If, during the applicable notice period under section 2912b, a claim would be barred by the statute of limitations or repose, for not longer than a number of days equal to the number of days in the applicable notice period after the date notice is given in compliance with section 2912b.

M.C.L. § 600.5856 now provides:

The statutes of limitations or repose are tolled in any of the following circumstances:

(a) At the time the complaint is filed, if a copy of the summons and complaint are served on the defendant within the time set forth in the supreme court rules.

(b) At the time jurisdiction over the defendant is otherwise acquired.

(c) At the time notice is given in compliance with the applicable notice period under section 2912b, if during that period a claim would be barred by the statute of limitations or repose; but in this case, the statute is tolled not longer than the number of days equal to the number of days remaining in the applicable notice period after the date notice is given.

M.C.L. § 600.5856. This current text of § 5856 was made effective April 22, 2004, in direct response to the Michigan Supreme Court's decision in *Gladych.*

The legislation enacting this change states:

(1) Except as provided in subsection (2), this amendatory act applies to civil actions filed on or after the effective date of this amendatory act [April 22, 2004].

(2) This amendatory act does not apply to a cause of action if the statute of limitations or repose for that cause of action has expired before the effective date of this amendatory act [April 22, 2004].

P.A.2004, No. 87, enacting § 1.

The *Gladych* decision was rendered on July 1, 2003, and its ruling was made to apply prospectively to all claims from that date forward. Therefore, for the time period between July 1, 2003 and April 22, 2004, the earlier text of M.C.L. § 600.5856, as interpreted by *Gladych,* controlled. The Court finds that Plaintiff's claim falls squarely within this time period, having been filed on October 27, 2003. Therefore, whether or not Plaintiff complied with M.C.L. § 600.5856 is a question the Court must reach guided by the earlier text of the statute and the *Gladych* decision.

Before the *Gladych* decision, the Michigan Supreme Court held that M.C.L. § 600.5856 dealt "only with prior lawsuits between the parties which [had] not adjudicated the merits of the action." *Buscaino v. Rhodes,* 385 Mich. 474, 482, 189 N.W.2d 202 (1971). The court examined what it perceived to be a conflict between M.C.L. § 600.5856 and G.C.R. 101,[2] and stated:

> Since there can be no question of "removing" the bar of the statute of limitations unless and until, in the absence of tolling the statute would have barred the action, there can be no issue of "tolling" in any case where the action is commenced within the statutory period of limitation.

*Buscaino,* 385 Mich. at 481, 189 N.W.2d 202. Therefore, the Michigan Supreme Court concluded that M.C.L. § 600.5856 did not apply to cases in which the complaint had been filed within the limitations period.

Thirty-two years later, in *Gladych,* 468 Mich. 594, 664 N.W.2d 705 (2003), the Michigan Supreme Court overruled this interpretation of M.C.L. § 600.5856. The court stated:

> [T]he interpretation of § 5856 adopted in *Buscaino* is contrary to the plain language of the statute and should be repudiated. Section 5805, by its very terms, creates only a threshold requirement to the filing of the complaint. Nowhere in the statute does it provide that,

---

**2.** G.C.R. 101 provided: "A civil action is commenced by filing a complaint with the court."

*Buscaino,* 385 Mich. at 480, 189 N.W.2d 202.

once the complaint is filed, the statute of limitations becomes irrelevant and tolling immaterial. Rather, one must then turn to § 5856, which provides the specific requirements for tolling the statute of limitations. If those requirements are not met, the period of limitations continues to run. Nothing in the statutory language of either § 5805 or § 5856 permits limiting § 5856 to claims in which prior actions were not adjudicated on the merits. Therefore, we overrule *Buscaino* and clarify that one must satisfy the requirements of § 5856 in order to toll the limitations period.

*Gladych,* 468 Mich. at 605, 664 N.W.2d 705. Accordingly, in order to have been timely, Plaintiff must have filed the Complaint and complied with the requirements of the earlier version of § 5856 within the limitations period. Specifically, before the limitations period expired, Plaintiff must have filed the complaint and either (1) effected service upon Defendant, or (2) placed a copy of the Summons and Complaint in the hands of an officer for service.

The Court must first determine when the time began running for the limitations period. Plaintiff alleges in the Complaint that the Film "premiered in Flint, Michigan on October 28, 2002," (Complaint, ¶ 5), and was released on "VHS and DVD for sale and rent on or about August 19, 2003." (*Id.,* ¶ 6). However, Plaintiff's Supplemental Brief argues that the date of release of the Film has not yet been established, and, therefore, the Court cannot grant Defendant's motion.

Defendant's Brief in Support of Motion for Summary Judgment accepts Plaintiff's October 28, 2002 Michigan premiere date for purposes of adjudication of the instant motion: "The actual premiere date was many months earlier, but, because the earlier date is not crucial to this Court's decision, this brief will accept Plaintiff's factual allegations *arguendo* for summary judg-

ment purposes." (Brief in Support of Motion for Summary Judgment, p. 1, n. 1). However, Defendant's Reply brief changes course, and argues that, pursuant to Fed. R.Evid. 902(6), the newspaper reviews of the Film provided in Defendant's submission conclusively establish that the Film premiered in New York and Los Angeles on October 11, 2002, and in the rest of the United States on October 25, 2002. (See Reply, p. 2). Thus Defendant's Reply contends that the statute of limitations period began on October 25, 2002.

The Court, mindful that Plaintiff has not been afforded an opportunity for meaningful discovery prior to the filing of the instant motion, finds, at this stage of the litigation, viewing the evidence in the light most favorable to Plaintiff, that the release date of the Film was the date alleged in the Complaint, to wit: October 28, 2002. Indeed, Defendant accepted that date as true, for purposes of the instant motion, in his principal brief, and the Court will accept that date for purposes of these motions.

Plaintiff's belated attempt to escape the date specifically set forth in the Complaint, by arguing that there is no established date does not succeed. Plaintiff has not sought to amend its Complaint. Therefore, for the purposes of the instant motion, the Court finds that the one-year limitations period with respect to the Film's theatrical release began to run on the date alleged in the Complaint, to wit: October 28, 2002.

The next question the Court must consider is whether the Film's subsequent release on VHS and DVD constituted a "republication" such that the limitations period would begin to run anew on August 19, 2003. (See Complaint, ¶ 6). To resolve this issue, the Court must examine the "single publication rule," as it relates to the statute of limitations.

Under the single publication rule, "the publication of a single defamatory item, such as a book or article, even if sold in multiple copies, and in numerous places, at various times, gives rise to 'only one cause of action which arises when the finished product is released by the publisher for sale.'" *Van Buskirk v. The New York Times Co.*, 325 F.3d 87, 89 (2nd Cir.2003)(quoting *Gregoire v. G.P. Putnam's Sons*, 298 N.Y. 119, 126, 81 N.E.2d 45 (1948)).[3] The rule defines publication as "the earliest date on which the work was placed on sale or became generally available to the public." *Id.* at 89 (quoting *Tomasino v. William Morrow & Co.*, 174 A.D.2d 734, 571 N.Y.S.2d 571, 572 (2d Dep't 1991)). "The rule implements a public policy of avoiding the exposure of publishers to 'a multiplicity of actions, leading to potential harassment and excessive liability, and draining of judicial resources,' as well as 'reducing the possibility of hardship to plaintiffs by allowing the collection of all damages in one case commenced in a single jurisdiction.'" *Id.* at 89–90 (quoting *Firth v. New York*, 98 N.Y.2d 365, 747 N.Y.S.2d 69, 71, 775 N.E.2d 463 (2002)).

The single publication rule does not apply, however, "where an item is published initially, but is then republished, not merely as a belated release of the original publication, but as a republication." *Zoll v. Jordache Ent., Inc.*, 2002 WL 31873461 at *8, 2002 U.S. Dist. LEXIS 24570 at *25, 31 Media L. Rep. 1779 (S.D.N.Y. Dec. 24, 2002)(unpublished opinion)(citing *Rinaldi v. Viking Penguin, Inc.*, 101 Misc.2d 928, 422 N.Y.S.2d 552 (1979)).

In the leading case examining the elements that give rise to a republication, *Rinaldi*, 422 N.Y.S.2d at 556, which involved a soft cover edition of a book previously published in hard cover, the court stated that the critical and controlling fac-

tor to be considered in determining whether a subsequent item is a "republication" is whether the publication has been substantially modified. *Zoll, supra* at 2002 WL 31873461, *8, 2002 U.S. Dist. LEXIS 24570, *27 (citing *Rinaldi*, 422 N.Y.S.2d at 556 ("By defining the fact pattern here as a republication of the alleged libel, as distinguished from a continuous publication, the *critical and controlling factor* is that although the books had been printed at one time, when they were released at a subsequent date, almost a year later, they had been substantially modified.")(emphasis provided by *Zoll* court)). "Other factors may serve as evidence of republication, including whether the 'subsequent publication is intended to and actually reaches a new audience,'" *Id.* (quoting *Firth*, 98 N.Y.2d 365, 747 N.Y.S.2d 69, 775 N.E.2d 463), and "whether the initial publisher had exclusive control over the publication through the period before republication." *Id.* at *27–28, 747 N.Y.S.2d 69, 775 N.E.2d 463 (citing *Rinaldi*, 422 N.Y.S.2d at 556).

■ The Court finds that the release of the Film on DVD constituted a republication, rather than a continuous publication. The "Bowling for Columbine" DVD, submitted by both parties pursuant to the Court's August 26, 2004 Order, contains the following "Special Features" not included in the Film's theatrical release:

1. Exclusive Michael Moore interview on his Oscar win & acceptance speech;

2. Personal introduction by Michael Moore;

3. "Return to Denver/Littleton" featurette;

4. Interview with Michael Moore by former Press Secretary Joe Lockhart;

---

**3.** See *Tocco v. Time, Inc.*, 195 F.Supp. 410, 413 (E.D.Mich.1961)(predicting Michigan courts would follow New York's single publication rule).

5. Audio commentary by receptionists and interns;

6. Teacher's guide;

7. Segment from "The Awful Truth II: Corporate Cops";

8. Michael Moore's "Action Guide";

9. Film festival scrapbook;

10. "The Charlie Rose Show" with Michael Moore

11. Marilyn Manson's "Fight Song" music video;

12. Photo gallery; and

13. Original theatrical trailer

("Bowling for Columbine" DVD, back cover). Many of these additional features were filmed and produced after the Film's release. Further, many of these additional features contain information related to the Film, rather than information not related to the Film.

The Court also finds that the Film's release on DVD was intended to reach a new audience, to wit: those persons who were either unwilling or unable to attend a screening of the Film at a theater, and those who wish to view the "Special Features" included in the DVD.

After evaluating the sum of the relevant factors required to be considered in determining whether the release of the Film on DVD constituted a republication, the Court concludes that the DVD release constituted a republication.

Therefore, the Court concludes that the limitations period began anew on August 19, 2003. Because Plaintiff filed the instant Complaint on October 27, 2003, and properly effectuated service on Defendant on November 5, 2003,[4] within the one-year limitations period, Plaintiff's claims with respect to the Film are timely. Accordingly, Defendant's Motion for Summary Judgment on statute of limitations grounds with regard to the Film, Counts I, III, V, VII, and IX, must be denied.

■ The Court must also determine whether Plaintiff's claims with regard to Defendant's statements on the Oprah Winfrey Show are barred by the one-year limitations period. The show on which Defendant's allegedly libelous statements were made originally aired on November 1, 2002. Plaintiff's Complaint also alleges that the statements were republished when the show re-aired on March 3, 2003. The Court disagrees. "[C]ourts applying the single publication rule to television broadcasts in the context of right of privacy claims have not treated each individual broadcast as a republication and have instead indexed the statute of limitations to the first airing." *Zoll, supra* at 2002 WL 31873461, *9, 2002 U.S. Dist. LEXIS 24570, *30–31 (citing *Nelson v. Working Class, Inc.*, 2000 WL 420554, 2000 U.S. Dist. LEXIS 4848 (S.D.N.Y. April 18, 2000)(unpublished opinion)). The Court finds that the "rerun" of the Oprah Winfrey Show on March 3, 2003 did not constitute a republication. Therefore, pursuant to the single publication rule, to be timely, Plaintiff must have both filed his Complaint and complied with M.C.L. § 600.5856 within one year of the show's airing, November 1, 2002.

■ Plaintiff's counsel argues that, by faxing a copy of the Complaint to Defense counsel on October 28, 2003, she complied with the requirements of M.C.L. § 600.5856 and therefore, as to the Oprah Winfrey Show, complied with the one-year statute of limitations. The Court disagrees. To have complied with § 5856, Plaintiff's counsel must have either (1) effected service upon Defendant, or (2)

---

4. The parties disagree on the date service was effectuated, but it is undisputed that the Complaint was served by November 5, 2003.

placed the Complaint in the hands of an officer for service on or before November 1, 2003. Plaintiff concedes that counsel did not place the Complaint in the hands of an officer for service prior to that date. Therefore, to be timely, Plaintiff's counsel must have effected service of the Complaint upon Defendant on or before November 1, 2003.

Fed.R.Civ.P. 4(e) governs service upon individuals within a judicial district of the United States, and provides:

Unless otherwise provided by federal law, service upon an individual from whom a waiver has not been obtained and filed, other than an infant or an incompetent person, may be effected in any judicial district of the United States:

(1) pursuant to the law of the state in which the district court is located, or in which service is effected, for the service of a summons upon the defendant in an action brought in the courts of general jurisdiction of the State; or

(2) by delivering a copy of the summons and of the complaint to the individual personally or by leaving copies thereof at the individual's dwelling house or usual place of abode with some person of suitable age and discretion then residing therein or by delivering a copy of the summons and of the complaint to an agent authorized by appointment or by law to receive service of process.

Fed.R.Civ.P. 4(e). Plaintiff argues that Defense counsel was an "agent authorized by appointment or by law to receive service of process." Defendant argues that current counsel, Herschel Fink, was not, at the time, counsel of record for Defendant and, therefore, not an "authorized agent." Defendant also argues that, even if counsel was an "authorized agent," service of process cannot be effected by facsimile and, therefore, service was not effected until the Complaint was sent via certified mail to Defendant's out-of-state counsel.

The Court agrees with Defendant's latter argument. Under the Federal Rules of Civil Procedure, service of process may not be effectuated by facsimile transmission. *See Glasser v. Heartland Health Care Ctr.*, 333 F.Supp.2d 607, 614, 2003 WL 23312815, *5 (E.D.Mich.2003). Therefore, even if current defense counsel Fink was an "authorized agent," service of process by facsimile is not permissible. Accordingly, the Court finds that service upon Defendant was not effectuated until a copy of the Complaint was sent, on November 5, 2004, via certified mail to Defendant's out-of-state counsel Hurwitz.

This Court finds that Defendant has met his burden of demonstrating the absence of any genuine issue of material fact with regard to his statute of limitations defense as to the Oprah Winfrey Show. Plaintiff has not put forth any specific facts either in his Complaint or in his Response to Defendant's Motion that would create a factual question for resolution at trial. Accordingly, based upon M.C.L. § 600.5856 and its interpretation in *Gladych,* Plaintiff's claims against Defendant regarding statements made on the Oprah Winfrey Show, are barred by the statute of limitations. Defendant's Motion for Summary Judgment is granted with respect to Counts II, IV, VI, and VIII.

## C. Standard for Judgment on the Pleadings as to Count X: "Right of Publicity"

For purposes of a motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c), "all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment." *Southern Ohio Bank v.*

*Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 479 F.2d 478, 480 (6th Cir.1973)(citing 2A Moore, Federal Practice, para. 12.15 (1972)); *see also United States v. Moriarty,* 8 F.3d 329, 332 (6th Cir.1993). "The motion is granted when no material issue of fact exists and the party making the motion is entitled to judgment as a matter of law." *Moriarty,* 8 F.3d at 332 (quoting *Paskvan v. City of Cleveland Civil Serv. Comm'n,* 946 F.2d 1233, 1235 (6th Cir. 1991)).

## D. First Amendment Defense to Count X: "Right of Publicity"

Defendant contends that the First Amendment requires dismissal of Count X—"Right of Publicity." Plaintiff argues:

> Plaintiff's claim of appropriation of his right to publicity by the defendant is based on the specific manner in which the defendant used plaintiff's identity and likeness. Specifically, the defendant portrays the plaintiff as a conspirator to the Oklahoma City Bombing who got away with it. The defendant did not engage in a truthful use of plaintiff's name and likeness. In stark contrast, the defendant falsely accused plaintiff of a horrendous crime, and he did so in an effort to make his movie Bowling for Columbine more shocking and controversial, and therefore, more profitable. Where, as here, the defendant falsely represents in the context of a documentary that plaintiff was a conspirator in the Oklahoma City Bombing, the defendant should not be afforded the protection of the First Amendment.

(Response Brief, p. 10).

The right of publicity has developed to protect the commercial interest of celebrities in their identities. *Carson v. Here's Johnny Portable Toilets, Inc.,* 698 F.2d 831, 835 (6th Cir.1983). The theory of the right is that a celebrity's identity can be valuable in the promotion of products, and the celebrity has an interest that may be protected from the unauthorized commercial exploitation of that identity. *Id.* Development of this theory of law in the State of Michigan has not been substantial; therefore, the Court must look to other jurisdictions as persuasive authority.

The First Amendment requires that the right to be protected from unauthorized publicity "be balanced against the public interest in the dissemination of news and information consistent with the democratic process under the constitutional guaranties of freedom of speech and of the press." *Gionfriddo v. Major League Baseball,* 94 Cal.App.4th 400, 409, 114 Cal.Rptr.2d 307 (2001)(quoting *Gill v. Hearst Publishing Co.,* 40 Cal.2d 224, 228, 253 P.2d 441 (1953)). To this end, "[c]ourts long ago recognized that a celebrity's right of publicity does not preclude others from incorporating a person's name, features or biography in a literary work, motion picture, news or entertainment story. Only the use of an individual's identity in advertising infringes on the persona." *Matthews v. Wozencraft,* 15 F.3d 432, 439 (5th Cir.1994)(quoting George M. Armstrong Jr., *The Reification of Celebrity: Persona as Property,* 51 LA. L.Rev. 443, 467 (1991)). Michigan courts have also recognized a fundamental difference between the use of a person's identity in connection with a legitimate news item and its commercial use in an advertisement for the pecuniary gain of the user. *Pallas v. Crowley, Milner and Co.,* 322 Mich. 411, 417, 33 N.W.2d 911 (1948). Thus, it is only in the context of "commercial speech" that a right to publicity claim arises.

■ The term "commercial speech" has a special meaning in the context of the First Amendment. "[T]he 'core notion of commercial speech' is that it 'does no more than propose a commercial transaction.'" *Gionfriddo,* 94 Cal.App.4th at 412, 114 Cal. Rptr.2d 307 (quoting *Hoffman v. Capital*

*Cities/ABC, Inc.*, 255 F.3d 1180, 1184 (9th Cir.2001)). Accordingly, courts have been consistently unwilling to recognize the right of publicity cause of action where the plaintiff's name or picture was used in connection with a matter of public interest, be it news or entertainment. *Rogers v. Grimaldi*, 695 F.Supp. 112, 121 (S.D.N.Y. 1988). The scope of the subject matter which may be considered of "public interest" or "newsworthy" has been defined in the most liberal and far-reaching terms. *Id.* at 117. The privilege of enlightening the public is by no means limited to dissemination of news in the sense of current events but extends far beyond to include all types of factual, educational, and historical data, or even entertainment and amusement, concerning interesting phases of human activity in general. *Id.* The First Amendment, therefore, provides greater protection to works of artistic expression such as movies, plays, books, and songs, than it provides to pure commercial speech. *Seale v. Gramercy Pictures*, 949 F.Supp. 331, 337 (E.D.Pa.1996). Moreover, matters of public interest may and often do involve wholly private individuals and may still be reported or depicted. *Friedan v. Friedan*, 414 F.Supp. 77, 79 (S.D.N.Y.1976).

■ The Court finds that Plaintiff's claim for "right of publicity" must be dismissed. The Film cannot be considered a work of pure "commercial speech," as it does much more than simply propose a commercial transaction. The Court likewise finds that the film addresses a matter of important public concern, to wit: the prominence of violence in American society.

Plaintiff argues that, while the above is true, he should not be involved in the Film, because the matter does not concern him as a private individual. The Court disagrees. Plaintiff was involved, time and again, in the media relating to one of the central stories of the Film, to wit: the Oklahoma City Bombing.

First, the Court notes, as Plaintiff concedes in his Complaint, the Federal Government did bring criminal charges against him:[5]

1. "[T]he government dropped the charges against the Plaintiff" (Complaint, p. 7, ¶ 26).

2. "The Defendant asserts as true portions of the criminal complaint against the Plaintiff." (*Id.*).

Plaintiff's Complaint further concedes that there were public transcripts and "numerous articles" about the charges against him:

1. "A cursory review of the transcripts of Plaintiff's May 23, 1995 bond hearing, or any of the numerous articles summarizing the bond hearing..." (Complaint, p. 8, ¶ 26)

2. "News of the charges being dismissed against James Nichols made

5. The Court notes that in the 1995 Federal criminal prosecution of Plaintiff, *United States v. James Nichols*, CR# 95–80361, he was charged in a Federal Grand Jury Indictment, *inter alia*, with: Count I—Conspiracy to Possess Unregistered Firearms. This Count stated that part of the unlawful conspiracy was that "the co-conspirators would manufacture destructive devices on Nichols' farm in Decker, Michigan." The "overt acts" included:

  2. In approximately 1992, James Nichols, Terry Nichols and Timothy McVeigh experimented in the manufacture and deto-

nation of destructive devices made up of readily available materials such as brake fluid and diesel fuel.

Indictment, p. 2.

Given that Terry Nichols and Timothy McVeigh were convicted of bombing the Oklahoma City Federal Courthouse, there is some degree of connection between Plaintiff and the Oklahoma City defendants.

The Court notes that on August 10, 1995, the Government moved to dismiss "all three explosives charges against James Nichols." U.S. Attorney Press Release, August 10, 1995.

both national and international headlines in May of 1995." (Complaint, p. 10, ¶ 30).

■ The Court takes judicial notice of the fact that Plaintiff voluntarily appeared for numerous media interviews subsequent to dismissal of the charges in the Eastern District of Michigan. The Court further notes that Plaintiff has co-authored a book, titled "Freedom's End: Conspiracy in Oklahoma," discussing the Oklahoma City Bombing. Plaintiff's response brief to Defendant's motion concedes that "[t]he Oklahoma City Bombing is surely a matter of public concern." (Plaintiff's Response Brief, p. 10).

Accordingly, taking all of the facts presented to the Court in Plaintiff's Complaint and his Response Brief to Defendant's Motion, and Plaintiff's legal arguments, in the light most favorable to Plaintiff, the non-moving party, under First Amendment jurisprudence Plaintiff's appearance in the film, which Plaintiff concedes deals with a matter of public concern, cannot support his claim for of commercial appropriation styled as the "Right of Publicity." [6]

Finally, Plaintiff claims that use of a clip from the Film featuring him for purposes of advertising the Film violated his right to publicity. The Court disagrees and dismisses this claim, because "if a video documentary contains an uncontested, though protected, use of a person's likeness, there is little question that an advertisement for the documentary containing a clip of that use would be permissible." *Gionfriddo*, 94 Cal.App.4th at 414, 114 Cal.Rptr.2d 307.

Accordingly, taking all of the facts presented to the Court in Plaintiff's Complaint and in his Response Brief in the light most favorable to Plaintiff, the Court concludes that Defendant's Motion to Dismiss Count X must be granted.

## CONCLUSION

For the reasons stated above, the Court GRANTS IN PART AND DENIES IN PART Defendant's Motion for Summary Judgment. Counts II, IV, VI, VIII and X are dismissed. The following Counts remain pending:

Count I Libel Per Se (based upon the Film)

Count III Defamation by Implication (based upon the Film)

Count V False Light Invasion of Privacy (based upon the Film)

Count VII Intentional Infliction of Emotional Distress (based upon the Film)

Count IX Negligent Infliction of Emotional Distress

**SO ORDERED.**

---

6. The Sixth Circuit refers to the claim alleged in Count X—appropriation of one's name or likeness for the defendant's advantage, as the "Right of Publicity." *Carson v. Here's Johnny Portable Toilets, Inc.,* 698 F.2d 831, 834 (6th Cir.1983).